The People of the State of New York vs. The New York Central Rail Road Company.

The act of the legislature, passed July 10, 1851, releasing all rail road corporations within the state from any liability to pay tolls upon freight, and repealing the existing statutes imposing such obligation upon them, was not in violation of any part of the constitution of the state of New York.

THIS action was brought for the recovery of tolls upon freight transported by the defendant, upon its rail road, since December 1, 1851. The defendant claimed to be exempted from the payment of all tolls since that day, by virtue of the provisions of an act of the legislature passed July 10, 1851, entitled "An act to abolish tolls on rail roads." By the first section of that act it was enacted that it should not be necessary for any rail road company in this state to pay any sums of money into the treasury, on account of the transportation of property on any rail road, on and after the 1st day of December, 1851. By the 2d section it was declared that it should not be necessary, after that day, for any rail road company to make any monthly statements to the comptroller of the property carried by it. And by the 3d section, all acts and parts of acts requiring the payment of state tolls by any rail road company, upon freight, were, after the said 1st day of December, 1851, so far as they conflicted with that act, repealed. (*Laws of* 1851, *p.* 927.)

The case came before the court on a motion for a new trial made by the plaintiff upon a case, with exceptions. The action came on for trial at the Orange county circuit court, held before Justice Brown, in January, 1861. After hearing the evidence on both sides, a motion was made by the defendant's counsel to dismiss the complaint, or nonsuit the plaintiffs, on several grounds, which motion was granted by the court. Thereupon the learned justice ordered that the exceptions taken by the plaintiffs' counsel on the trial should be heard in the first instance at the general term. The complaint alleged in substance : *First.* The incorporation of the defend-

ant under the act of April 2d, 1853, and that pursuant to the provisions of the said act the defendant became subject to the liabilities and provisions of the general rail road act of April 2, 1850, one of which provisions is set forth, viz: the 29th section of said act, subjecting any road formed under it, and running parallel or nearly parallel to any canal of this state, and within thirty miles of said canal, to tolls on property other than baggage transported upon it, for the same amount that would have been payable to the state, if the property had been transported on such canal. That the defendant's rail road runs parallel, or nearly so, to the Erie canal, and not more than thirty miles therefrom. *Second.* That seven rail road corporations, known as the Albany and Schenectady, the Utica and Schenectady, the Syracuse and Utica, the Auburn and Syracuse, the Auburn and Rochester, the Tonawanda, and the Attica and Buffalo rail road companies, were among the corporations consolidated into the defendant, and, previous to and in the year 1844, formed a connected and continuous line of rail road communication from or near the navigable waters of Lake Erie, to or near the navigable water of the Hudson river at Albany. *Third.* That four of said companies, viz. the Albany and Schenectady, the Tonawanda, the Auburn and Syracuse, and the Attica and Buffalo rail road companies were, by their charters, authorized and empowered to carry freight without being required to pay tolls. That the Syracuse and Utica Rail Road Company were empowered by their charter to carry freight, but were required to pay into the canal fund tolls on property trans-ported during the period of canal navigation ; that the Utica and Schenectady Rail Road Company were prohibited by their charter from carrying any freight: all which charters were liable to alteration or repeal, as will appear by the several acts which are referred to as part of the complaint. *Fourth.* That by an act passed May 7th, 1844, the Utica and Schenectady Rail Road Company were authorized to carry property during the suspension of canal navigation and to receive

compensation therefor; and were required to make returns of such property carried, at such period and in such manner as should be directed by the commissioners of the canal fund, and to pay to the said commissioners the same tolls as canal tolls. That it was also provided by said act that five of the other companies, naming them, should make the same returns, be liable to the same tolls, and subject to the same regulations. *Fifth.* That the said companies accepted the privileges and assumed the obligations of the last named act, and carried large quantities of freight and paid tolls thereon until at and after November 3d, 1846, when the new constitution was adopted, and January 1st, 1847, when the same became in force, " *which said tolls at that time formed and were a part of the revenues of the state canals.*" *Sixth.* That by sections 1, 2 and 3, of the seventh article of said constitution, all the " revenues of the state canals" were pledged and appropriated to the payment of the interest and the redemption of the principal of the debts of this state, and for the use and benefit of the general fund, and for the completion of the Erie canal enlargement, and the Genesee Valley and Black River canals, until the said canals should be completed. That neither July 10th, 1851, when the act releasing tolls was passed, nor December 1st, 1851, when it became operative, were the said canals completed, or the debts redeemed out of the said revenues, nor are said canals now completed or the said debts paid. That by section 6, article 7, of the constitution, the legislature are prohibited from selling, leasing or otherwise disposing of any of the canals of this state, but they are to remain the property of the state, and under its management for ever. *Seventh.* That by an act of May 12th, 1847, the Utica and Schenectady Rail Road Company were authorized to transport freight, and were required to make returns as should be directed by the commissioners of the canal fund, and were required to pay into the treasury of the state the same tolls per mile as would have been paid on such property if it had been transported upon the canals. That

by the same act, seven other companies, naming them, were subject to the same provisions, with the further provision that no freight passing from one of said roads to a connecting road, for transportation, should be deemed local freight. That said act provided that the tolls thus collected *should be deemed to belong to the canal fund, and should be paid over and applied in the same manner as tolls collected on freight transported on the canals.* *Eighth.* That the tolls provided for and collected under these acts, became and were a part of the revenues of the state canals. That those which were collected under the last act, accruing during the period of canal navigation, were derived from freight appurtenant and belonging to said canals; and said rail roads, at the time of the adoption of the said constitutional provisions, were incapable of transporting said freight for want of corporate power, nor was there, nor is there, any other mode by which the said freight could or would be transported, except the said rail road and the said canals. *Ninth.* That while the said toll and revenues formed and were a part of the said revenues of the state canals, and on the 10th of July, 1851, the legislature of the state of New York passed a pretended act, whereby it was pretended and attempted to be enacted, that all acts and parts of acts requiring the payment of state tolls by any rail road company for the transportation of property on any rail road were, after the first day of December then next, repealed. That the said act was and is unconstitutional and void, inasmuch as the same *disposed of the said canals and their freight and revenues* in a manner inconsistent with the provisions of the constitution. That notwithstanding said act the said companies were, and the defendant is, bound to pay to the canal fund the same rates of toll as if said act had not been passed. *Tenth.* That the several companies consolidated (naming seven or eight of them) after December 1, 1851, and before the consolidation, carried freight subject to tolls, to a large sum of money, and the defendant is liable therefor to the plaintiffs; and that said defendant, since the consoli-

dation, and prior to the 1st day of July, 1860, has carried large quantities of freight subject to the payment of such tolls aforesaid, all of which said tolls are and form a part of the revenues of the state canals—which tolls amount to five millions of dollars, for which sum the plaintiffs demand judgment.

The following is the substance of the answer: *First.* It denies that the defendant is subject to the provision in section 29 of the act of April 2d, 1850, referred to in the complaint. It denies that the tolls collected under the act of 1847, occurring during the period of canal navigation, arose from freight appurtenant and belonging to the said canals. Matters of law having been averred, these matters are denied in the answer. It denies that the rail road and canals are the only modes by which the freight could or would be transported, and avers that much of it would have passed by and through routes and channels, some of which have been made and opened by the authority and aid of the plaintiffs. It denies that the Schenectady and Utica company was required by its charter to pay tolls into the canal fund. It has no knowledge or information sufficient to form a belief, as to whether the several rail road companies named in the complaint, carried large amounts and paid freights and tolls imposed by the act of 1844. It denies that any one of those companies, or the defendant, carried freight subject to the payment of canal tolls after December 1st, 1851. *Second.* It pleads the statute of limitations to all claims accruing more than six years prior to the commencement of the action. *Third.* The act of July 10th, 1851, is pleaded with an averment that three fifths of both houses were present at its passage. It is averred that the governor signed it, and that it is a valid law, and its provisions are recited. *Fourth.* It avers that all laws requiring payment of tolls by rail roads are in conflict with sections 8, 9 and 10, of article 1, of the constitution of the United States, and the power to repeal was reserved in the acts of 1844 and 1847, mentioned in the complaint. *Fifth.* The act

of April 5th, 1850, releasing live stock and other articles from tolls, is pleaded.

It is averred that in 1853 and 1854, the plaintiffs amended' the constitution, by providing a substitute for section 3, and article 7, by which substitute the plaintiffs authorized the canal board to reduce the rates of tolls with the concurrence of the legislature, and to remove them entirely, whereby the plaintiffs ratified the acts of 1850 and 1847. That since the adoption of the present constitution, the canal board, with the concurrence of the legislature, has reduced the rates of toll on property transported on the state canals, so as materially to diminish the revenues; and the plaintiffs' officers have misappropriated, diverted and squandered said revenues, and therefore the canals are unfinished, and the requirements of sections 1, 2 and 3, of article 7, have not been fulfilled. That the rates of toll have been frequently changed by the plaintiffs' authority since July 10th, 1851; that since that time the canal board has made no rules or regulations as required by sections 4 and 5 of the act of May 7th, 1844, and by section 4 of the act of May 12th, 1847; and that the commissioners of the canal fund have never, in any way, since the act of 1857, until May 4th, 1860, made any rule or regulation as required by section 4 of the act of 1847. That relying on the validity of the act of 1851, the defendant accepted its charter and contracted large obligations, for which its bonds are now out and unpaid; and has charged and received less compensation than it would have done, but for the act of 1851, and has issued scrip for its capital stock, large amounts of which have been bought and sold by its stock-holders, relying on the validity of said act; that the defendant will suffer damages to a large amount if the said act is declared void. The defendant insists that the plaintiffs are, by these acts of the legislature, by the amendments to the constitution, by the omission of the canal board and the commissioners of the canal fund to adopt rules as above stated, by the reduction and alteration of the rates of toll, by

its conduct in authorizing and aiding in the construction of other channels of trade, by which business has been diverted from the defendant's road, estopped in law and equity from denying the validity of the act of 1851, or maintaining this action.

Although the complaint claims tolls since December, 1851, the bill of particulars was confined to the period of six years prior to the commencement of the action, and this amounted to the sum of about four millions of dollars. On the trial of the cause the claim was reduced still further, by the abandonment, on the part of the attorney general, of all claim for tolls on way freight. Therefore the claim was confined to tolls upon property transported from Albany to Buffalo.

*Charles G. Myers,* (attorney general,) for the people.

*L. Tremain* and *A. C. Paige,* for the defendant.

*By the Court,* EMOTT, J. The magnitude of the interests and the importance of the principles involved in this cause, forbid our giving a formal or even a silent judgment. At the same time, the announcement that the parties will litigate the question to the last tribunal of appeal renders it unnecessary, and in our opinion inexpedient, that we should do more than briefly to indicate the grounds on which our judgment rests.

The action is brought to recover from the New York Central Rail Road Company tolls upon the freight which has been transported over its road since December 1st, 1851. Previous to that day the rail road companies to which the defendant succeeded, paid into the treasury of the state tolls at rates fixed by law, upon all the freight which it carried. Since that day no such tolls have been received from the large quantities of merchandise which have passed over these avenues of trade. The amount of the claim now made for these taxes or tolls is obviously very large ; it is put by the plaintiffs at $5,000,000.

The defense to this claim is, that the legislature, by an act passed July 10th, 1851, released all rail road corporations within the.state from any liability to pay tolls upon freight, and repealed the existing statutes imposing such obligations upon them. The reply to this defense is, that this act of the legislature transcended their constitutional powers, and is void; and the question thus presented is of great importance in the legislation of the state.

The defendant is a corporation formed by the consolidation, under an act passed in 1853, of several existing rail road corporations. We assume, for the purposes of the present discussion, that the new corporation thus formed succeeded to all the rights and is subject to all the restrictions and obligations which are found in the charters of the companies from which it was composed, or in the various acts affecting them. At least, we assume that the New York Central Rail Road Company was bound to pay tolls in the same manner and to the same extent as were these companies, and stands in the same relation to the statute now in question as they would if they had continued separately to exist.

The right to carry freight from Buffalo to Albany, or over all the separate rail roads then composing the continuous line of railway from the lakes to the Hudson river, was conferred by an act passed May 7th, 1844. Some of these companies were indeed previous to that time authorized to carry freight, but others were not; and therefore no freight could before that time have been carried by rail road from Lake Erie to tide-water, so as to compete with the canals of the state. The ·right to carry freight upon these rail roads in competition with the canals was therefore in effect conferred by the act of May 7th, 1844, and by that act the rail road companies were required to pay to the state tolls on all the freight thus transported. These tolls were fixed by the statute at the same rates as the tolls upon the freight carried on the canals; and were directed to be paid to the commissioners of the canal fund.

The People *v.* New York Central Rail Road Company.

This act was in force, and these tolls were thus required and received, in the year 1846, when the present constitution of the state was framed and adopted, and on the 1st of January, 1847, when it went into effect. It may be observed, however, that it was not until May 12th, 1847, that a distinct appropriation of these rail road tolls was made to the canal fund, or that they were expressly declared to belong to that fund, and directed to be applied in the same manner as the canal tolls. The act releasing the then existing rail roads, and consequently the defendant, from the payment of these tolls, was passed as already stated July 10th, 1851, and went into operation December 1st, 1851.

The argument for the plaintiffs may be summed up thus: The act releasing the rail road companies, afterwards consolidated into the defendant's, from the payment of tolls, is unconstitutional; because, 1st, the constitution pledges to certain purposes all the revenues of the state canals; these rail road tolls were a part of the revenues of the canals, and to release them or discharge the rail roads from the obligation to pay them, was a violation of this pledge; 2d, because the constitution forbids the sale or disposal of the canals of the state, the rail road tolls were a part of the "canals of the state," and the release of them, or of the liability to pay them, was a disposal of a part of the canals.

With respect to the latter argument, it is sufficient to say that we perceive no reason or rule of construction which would authorize or require us to hold that the tolls payable by rail roads to the commissioners of the canal fund, constituted a part of the canals. If they are a part of the revenues of the canals, which is the fundamental proposition upon which the main argument for the plaintiffs rests, they are not a part of the canals. The revenues of a person, natural or artificial, are not the person, nor in any proper use of language a part of the person. It is not as one appellation including all which the canals may earn or produce, as well as what they are, that the word "*canals*" is used in the constitution. The

phrase must be understood in its ordinary sense, meaning the material structures. Their ownership and possession will involve of course the right to their use, and any profit or income to be derived from such use. But these would pass with or belong to the canals from the necessity of the thing, because they are consequent upon their possession, and not because the revenue thus to be earned is a part of the canals themselves. The language of the constitutional provision cited (art. 7, § 6) is this: "The legislature shall not sell, lease or otherwise dispose of any of the canals of the state; but they shall remain the property of the state and under its management for ever." It appears to us very plain that this language refers to the structures of the canals. Its object is to preserve to the state in perpetuity the control as well as the profits and advantages to be derived from the transportation of property upon these great artificial avenues, so that these profits and advantages should enure to the benefit of the whole people. The alienation of the canals themselves, and not the disposition of any part of their revenues or of any funds appropriated to that support, is what is forbidden. For my own part I see no reason to suppose that if the pledges of the revenues of the canals which are contained in the preceding sections of this article do not forbid, the legislature may not make any disposition whatever of the revenue obtained from tolls imposed on freight transported on the canals themselves, without contravening in any respect this prohibition of the constitution. I suppose, farther, that a reduction of the tolls on freight carried on the canals, or of any of their direct and proper revenues to the minimum, or even to nothing, whatever might be the policy or the propriety of such a course, could not be successfully assailed as an unconstitutional sale or disposal of the property which this constitutional provision makes inalienable. Still less can such a reduction, or a relinquishment of charges upon other modes of transport, which had been imposed and applied to protect or to yield an income to the canals, be con-

sidered in such a light. Such acts are rather acts of management of the canals, and this is expressly reserved to the state, to be exercised by its agents; and into the wisdom or expediency of this management, the courts are not to inquire. The counsel for the people invoked against the constitutionality of this statute the analogy of a mill, the title to which should be held by a trustee with a right to exact suit to the mill, or the exclusive right to grind for certain persons or property attached to it. It is said that a court of equity, at the instance of the cestuis que trust, would restrain a release of an adjoining mill from a toll which had been imposed as a condition of allowing its owner to deal with those who were thus bound. But we are not upon a question of trust, or of equity. Here are no cestuis que trust, and we have to determine, not what was equitable for the state of New York to do, but what its legislature—otherwise supreme—was forbidden to do, by its organic law.

The principal argument of the attorney general was made upon the other branch of the case. His reasoning rests upon two propositions: 1st. That the tolls required in 1846 by the then existing statutes to be paid to the commissioners of the canal fund, upon all property transported by these rail roads, were a part of the "revenues of the state canals," or the "surplus revenues of the canals," mentioned in sections 1, 2 and 3 of the 7th article of the constitution. 2d. That releasing or relinquishing these tolls, and allowing the rail roads to transport property without paying them, violated the provisions of these sections, which pledged or appropriated certain amounts of these revenues, first for a sinking fund to pay the interest and redeem the principal of the canal debt; next for a like sinking fund to pay the general fund debt, and then to defray the expenses of the state, and to complete the canals.

The first of these propositions presents a question of the meaning of words, or of the sense in which a particular phrase is used in the constitution of the state. The plain and

natural import of the phrase "revenues of the canals," construed without reference to any extrinsic facts, would certainly be the revenues earned by or upon the canals. If it could be construed to mean any thing else, taken in connection with the fact that the canal fund, that is, the fund established for the support of the canals, is replenished from other sources of income, yet this is clearly its primary meaning.

Looking at the meaning of the phrase more narrowly, however, and looking at the instrument in which it occurs, we think that in this article of the constitution the words "revenues of the canals," wherever they occur, mean only the tolls received for the use of the canals, for transportation, and the rents received for the use of their surplus waters. Revenue is the yearly income of a government, or a person natural or artificial, from the property belonging to such government or person. Thus we speak of the revenues of the state of New York, of the New York Central Rail Road Company, and the like; and we may also speak of the revenues of any individual, although the word is not so often applied to individuals. The canals of this state, however, are not the state, nor are they a corporation, or a natural or artificial being, or possessed as such of property or income. The canals are simply public works, material structures, made and used for travel and transportation, and capable of yielding an income to their owners from such use. In a strict sense they have no revenues, because they have no recognized individual legal existence. Strictly speaking, the canals only yield a revenue; but it is the revenue of their owners, the state, or the people. In the part of the constitution now under consideration they are personified, as was observed by one of the counsel, and the revenues derived from the property which constitutes the canals, are spoken of as the revenues of the canals. It will be observed, however, that it is not *the canal fund* which is thus spoken of and personified, but *the canals*. In the 5th section of this article the revenues of the sinking funds are spoken of, and in such

a manner and connection as to make it apparent that taxes laid to replenish these funds, are considered and intended as a part of their revenues. A fund is merely a name for a collection or an appropriation of money. It may be nothing but a designation of one branch of the accounts of the state, or of a certain amount of money when collected to be applied to a particular purpose. It may have no property and represent no investments, and what are called its revenues may include all the moneys appropriated or directed to be paid to it, or for its benefit, or that of the objects it represents. If the constitution had spoken of the revenues of the canal fund, its meaning and effect might have been different. But the canals themselves yield an income from their use, and that is their revenue, although the canal fund may have other sources of supply. But these sources of income or supply, and among them rail road tolls, when these are appropriated to the canal fund, do not become a part of the canals, nor are they the property of the canals ; and therefore the revenue thence derived in any year is not a part of the revenues of the canals, even if it might, in a qualified sense, be spoken of as part of the revenues of the canal fund.

If it was otherwise, and the next position of the attorney general were correct, that these supplies of income are sacredly and perpetually pledged and protected, not only against the abstraction or the diversion of their proceeds, but against their diminution, any tax or toll which may be levied at any time by the legislature for the benefit of the canal fund would become at once irrepealable and altogether beyond legislative control.

We do not find in the facts and documents adduced to explain the meaning which has been given to this phrase, enough to shake our conclusion that the phrase, "revenues of the canals," does not include the tolls levied upon rail roads for the transportation of freight, under the statutes existing January 1st, 1847, and by the act of May 12th, in that year, expressly appropriated to the canal fund.

But if we had come to a contrary conclusion on this point, we should be unable to agree to the doctrine which the attorney general deduces from the effect of the 7th article of the constitution upon these revenues. In the most favorable view which can be taken of this question for the plaintiffs, the tolls which were imposed upon freight carried by the rail roads can only be regarded as assimilated to tolls laid upon freight transported on the canals. It is conceding all which can be claimed, to consider these rail road tolls in the same class or category as canal tolls, as the tolls upon a particular class of freight, or the tolls upon a particular canal. If the rail road tolls are " revenues of the canals," they are certainly only a part of those revenues. There has never been any question, so far as I am aware, of the power of the legislature to regulate and graduate the canal tolls. Such a power has been repeatedly exercised or conferred upon the canal board. The tolls have been so graduated as to promote trade, or to increase the revenue, or both. It has indeed been suggested that the legislature would have no power to reduce the tolls, so that they would reduce the amount necessary to make the annual payments to the sinking funds. It is unnecessary to determine whether an exercise of legislative power which would have that consequence or effect, would be set aside ; because it is not alleged nor proved that taking away or releasing the tolls from freight carried on this rail road, would so diminish the revenues that these payments could not be made.

But the doctrine contended for goes far beyond this. It is announced in the brief for the People, as a pledge of all the revenues of the canals, at their highest revenue standard, to the payment of the public debt, and the completion of the canals; and this means, in the argument against this law, a pledge that every class of tolls or revenue shall be kept at the highest standard. I find no such pledge in the constitution. All that its terms express by way of promise or pledge is that these revenues shall be applied in a certain way. It

may be that this involves a pledge that these revenues shall be made to produce a sufficiênt amount to make the payments called for by the constitution if possible; for even a constitution cannot compel an impossibility, though it may demand a resort to taxation to repair the consequences of a course of action or a state of circumstances which has defeated its intention. I neither affirm nor deny that proposition: it is not what we are considering. The argument for the present prosecution demands more than this; it demands that all these tolls or taxes should be kept at the highest revenue standard. What is to be the measure of the highest revenue standard, and who is to apply it? Leaving out of the case the alleged obligation to raise an amount necessary to meet the payments to the sinking funds, because that is not involved in the present issue, it is very clear, at least to our minds, that the whole subject of the regulation of the tolls belongs to legislative discretion. This discretion must involve the complete control of the subject. It must include the right to modify, to increase, to diminish or to abolish any class of charges. It is for the legislature, and not the courts, to fix a tariff of tolls, to determine what articles may be transported free of toll, and what shall be charged upon others; what avenues of transportation shall be open at law, and what shall require heavy charges for their use, and whether the interests of the state require that freight shall be allowed to pass without charge over any of its public works, either those owned by the state or those competing with them. In the exercise of this discretion the legislature can consider all the interests of the state, commercial as well as financial, and in any particular statute or ordinance we are bound to presume that they have acted upon such considerations.

Where the constitution expressly, or by necessary consequence from its express provisions, either requires or forbids an act, there can be no hesitation in enforcing its mandate. But for myself, at least, I cannot agree to the doctrine which

was urged upon us, of an implied prohibition of legislative action. I am not prepared to declare an act of the legislature void, because it is in conflict with what I may be led to suppose is the intent or the spirit of the constitution. Such a doctrine would be more dangerous than the most latitudinarian construction of express grants of power. The language of an express power, or an express prohibition, in a constitutional instrument, is comparatively plain, and presents a narrow question. Nor does it widen the field of discussion very much, to consider what powers are absolutely necessary to execute any express duty enjoined or authority conferred upon the legislature. But to permit the courts to control and annul legislative action according to their speculations upon the spirit or the intent of the constitution, would be at variance with all sound, not to say strict, principles of construction, and would invest judicial tribunals with new and dangerous powers. The people of the state in their sovereign capacity possess an absolute and uncontrolled power of legislation. By the constitution this legislative power of the people is conferred upon and vested in the legislature. There is no constituent body between the people and the legislature to whom power is reserved; nor are there any reservations in the grant of power to the legislature, except the express prohibitions of the constitution. When an act of the legislature plainly conflicts with the express requirements or the express prohibitions of the organic law, it is the duty of the courts to arrest its execution. But it is only repeating what has been said by every judge who has ever considered the question of the constitutionality of an act of the legislature, even in cases where the question arises upon express provisions of the fundamental law, that their infraction must be plain and palpable.

This article of the constitution contains an express pledge of the application of the canal revenues, and any diversion of them to other purposes would undoubtedly be a violation of that pledge. But the law in question makes no diversion

The People *v.* New York Central Rail Road Company.

of these revenues, or of the tolls upon which it operates. It does not direct their use or application for other purposes than those specified in the constitution. It releases and relinquishes railway tolls altogether, and it is to our minds a pure question of legislative discretion, whether this should have been done or not. It is not even apparent that the abolition of these tolls will cause a deficiency in the revenues of the canal fund, or whether, if such a deficiency exist, it has been or can be supplied by increased tolls on property transported on the canals. However the facts may be in these particulars, the wisdom and policy of such legislation as that now under consideration, and its effect upon the public credit, and the public interests, are questions for the legislature and the people, and not for the courts. If we could interpose to prevent a misapplication of the revenues of the state, or of any of its works or funds, it does not follow that we can prevent the diminution or the destruction of any part of those revenues, even if we should think the latter course as much at variance with the spirit of the constitution as the former would be with its letter.

We have considered all the grounds upon which the act of July 10th, 1851, is attacked, and have thus briefly noticed such parts of the argument upon them as was necessary to explain our judgment. We are not convinced that the act in question is in violation of any part of the constitution, and therefore the defendant must have judgment in this case.

Judgment for defendant.

[Dutchess General Term, May 13, 1861. *Emott, Brown* and *Scrugham,* Justices.]