Lund vs. Chippewa County and others.

Lund, Respondent, vs. Chippewa County and others, Appellants.

*May 27 — September 22, 1896.*

*Counties: "Municipalities:" Donations for establishment and building of state institution: Issuance of bonds: Levy of taxes: Public policy: Constitutional law.*

1. Counties are municipalities within the meaning of sec. 2, ch. 138, Laws of 1895, empowering "municipalities of this state" to make donations of "money or other securities" for the establishment and building of a state home for the feeble-minded.

2. The power given by said act to a county to make donations of "money or other securities" includes the power to issue bonds for that purpose; and the county board has power, under subd. 5, sec. 669, R. S., to raise money by taxation for the payment of bonds so issued.

3. The donations authorized by said act being merely to secure a site for the home, and in no way affecting the efficiency and successful operation of the institution when established, such authorization was not against public policy.

4. The authorization of such donations was not repugnant to sec. 1, art. VIII, Const., providing that "the rule of taxation shall be uniform." Although the proposed home was to be purely a state institution, and the state could not by direct action compel the county in which it should be located to pay an additional amount or levy a special tax to establish and build it, yet it might give such county authority so to do.

5. The establishment and building of a state home for the feeble-minded is such a public purpose, and the special benefits accruing to the county in which it may be located are such, that a statute authorizing that county to make donations of money or other securities for that purpose is valid.

APPEAL from an order of the circuit court for Chippewa county: A. J. VINJE, Circuit Judge. *Reversed.*

Ch. 138, Laws of 1895, entitled "An act to establish a home for the custody, training and education of the feeble-minded, epileptic and idiotic, and to appropriate certain sums of money therein named," was published and went into effect

April 9, 1895, and provided, among other things, in effect:
(Sec. 1) That there is created and established, for the care,
custody, and training of the feeble-minded, epileptic, and
idiotic of this state, an institution to be known as "The
Wisconsin Home for the Feeble-Minded." (Sec. 2) That the
state board of control shall select a suitable site for such a
home, and shall have power to receive proposals for a dona-
tion of land to the state for such site, and to receive the
same by gift, or to purchase such site; that they may receive
proposals for donations of money or other securities, in be-
half of this state, for the benefit of such home; that they
may locate the same, by and with the consent of the gov-
ernor of the state, at such point as they, together with the
governor, shall deem for the best interests of this state, and
receive any donations or bequests which may be made for
its maintenance and support; that the site selected shall
comprise not less than 200 acres of land possessing good
facilities for drainage and sewerage, and an abundant sup-
ply of pure water; that municipalities of this state are em-
powered to make the donations herein mentioned for the
establishment and building of such a home. (Sec. 3) That
the general supervision and government of the home shall
be vested in the state board of control, pursuant to the law
creating and defining the duties of said board, and said board
shall establish a system of government for the institution,
and shall make all necessary rules and regulations for en-
forcing discipline, imparting instruction, preserving health,
and for the proper care and training of the persons in said
home; that said board shall appoint a superintendent, a
matron, and such other officers, teachers, and employees as
shall be necessary, who shall severally hold their offices or
places during the pleasure of the board. (Sec. 4) That all
feeble-minded, epileptic, and idiotic persons, residents of the
state, or any such persons found therein whose residence
cannot be ascertained, may be admitted to said home, and

receive the benefit thereof, free of charge, subject to such rules and regulations as may be made by the said board of control; that said board shall adopt and publish a schedule of maximum charges and expenses for such patients as may be placed in the home, but who shall not be entitled to be admitted or kept free of charge: provided, that all provisions of ch. 32, R. S., relating to the support of insane persons and the liability of counties therefor, shall also apply, as far as practicable, to persons admitted to the home for feeble-minded. (Sec. 6) That said home shall be organized into departments, as follows: First, a school department for the educable grades or classes; second, a custodial department for the helpless and lower types; third, such other departments or colonies as the needs of the institution may require; and that as soon as practicable such trades and manual industries as are adapted to these several departments shall be introduced and established by the board of control.

Some time prior to November 19, 1895, the state board of control located said home at Chippewa Falls, in the extreme southerly end of *Chippewa* county. The board of supervisors of that county, at its regular annual meeting held November 19, 1895, passed an ordinance entitled "An ordinance to provide for the donation of certain money to the Wisconsin Home for the Feeble-Minded, and to provide for the issue of county bonds therefor;" and said ordinance was duly published as required by law November 20, 1895.

On December 4, 1895, the plaintiff, a resident and freeholder and taxpayer of *Chippewa* county, commenced this action, in behalf of himself and all other taxpayers of that county, against the county, its treasurer, and clerk, and the chairman of its board of supervisors, and in his complaint alleged the facts above stated, and gave a copy of said ordinance, and also alleged, in effect, that pursuant to and by virtue of that ordinance the defendants *Firth* and *Sharp*, as

county clerk and chairman of the board of supervisors, threatened to, and were about to, issue and execute, in their official capacity as such clerk and chairman, in behalf of the county, twelve negotiable bonds of the face value of $1,000 each, and one negotiable bond of the face value of $700, bearing interest at the rate of five per cent. per annum, payable annually, and the principal sums to be evidenced by such bonds to be made payable five years from that date, and that the treasurer of the county, *Henry Goetz*, had advertised for sale, and threatened to sell, said bonds, December 5, 1895, at public auction, to the highest bidder; that the county clerk threatened to and would insert $3,750 annually in the tax roll of the county for five years, beginning with 1896, and would, unless restrained, levy the same against all the taxable property of the county for the purpose of paying said bonds; that said ordinance was and is illegal and void; that the appropriation therein contained for the payment of said bonds was and is wholly without authority of law, in that the county board had no legal authority to create an indebtedness of the county for the purposes mentioned; that the plaintiff's taxes, and the taxes of all other taxpayers of the county, would be largely increased by reason of such illegal appropriation; and that they would thereby suffer irreparable loss and injury. The plaintiff prayed judgment that the ordinance, and all proceedings under and by virtue thereof, be set aside and declared null and void; and that the defendants named, and their successors in office, be perpetually restrained and enjoined from enforcing the same.

To such complaint the defendants demurred on the ground that it did not state a cause of action. From the order overruling that demurrer the defendants appeal.

For the appellants there was a brief by *W. R. Hoyt* and *L. J. Rusk*, and oral argument by *Mr. Rusk*.

For the respondent there were briefs by *C. T. Bundy*, attorney, and *T. F. Frawley*, of counsel, and oral argu-

ment by *Mr. Bundy*. They contended, *inter alia*, that a county is not a municipality. Ency. Brit. "MUNICIPALITY;" 1 Dillon, Mun. Corp. §§ 22–27; Desty, Taxation, 470–495, §§ 97–99; Cooley, Const. Lim. 240, 241; *Waltham v. Kemper*, 55 Ill. 346; *Lorillard v. Monroe*, 11 N. Y. 392; *Williamsport v. Comm.* 84 Pa. St. 499; *Norton v. Peck*, 3 Wis. 714; *Eaton v. Manitowoc Co.* 44 id. 489; *Chicago & N. W. R. Co. v. Oconto*, 50 id. 195; *Smith v. Sherry*, id. 213, 216; *Cathcart v. Comstock*, 56 id. 609; *State ex rel. Hiles v. Wood Co.* 61 id. 280. The benefits to be derived by *Chippewa* county from the location of this institution at Chippewa Falls, are not such as to make a tax levied to establish and maintain it a tax levied for corporate purposes. *Livingston Co. v. Weider*, 64 Ill. 427; *Wasson v. Wayne Co. Comm'rs*, 17 L. R. A. 795; *State ex rel. Board of Education v. Haben*, 22 Wis. 664; *State ex rel. McCurdy v. Tappan*, 29 id. 664.

The following opinion was filed June 19, 1896:

CASSODAY, C. J. 1. It is contended by counsel for the plaintiff that a county is not a municipality, within the meaning of ch. 138, Laws of 1895. Properly speaking, municipal corporations are brought into existence at the instance or request of the persons residing therein, for their own local advancement and convenience. On the other hand, counties are local subdivisions of the state, created by its own sovereign power and will, without the particular solicitation, consent, or concurrent action of the citizens thereof, and almost exclusively with a view to the policy of the state at large, for purposes of political organization and civil administration. 1 Dillon, Mun. Corp. § 23. The same learned author says: "The phrase 'municipal corporation' is used with us, in general, in the strict, proper sense just mentioned; but sometimes it is used in a broader sense, that includes also public or *quasi* corporations, the principal purpose of whose creation is as an instrumentality of the state,

and not for the regulation of the local and special affairs of a compact community." Id. § 20. We are constrained to hold that counties are municipalities, within the meaning of the provision of the act which declares that " municipalities of this state are hereby empowered to make the donations herein mentioned for the establishment and building of such a home." Laws of 1895, ch. 138, sec. 2. Thus in *Eaton v. Manitowoc Co.* 44 Wis. 493, it is said: "Towns are often called in common parlance, and sometimes unguardedly in statutes, municipal corporations, in connection with counties, cities, and villages; but when so called it is in the sense of mere corporations, or *quasi* corporations, or of corporations *sub modo,* only, and not in the sense of municipalities proper." *Cathcart v. Comstock,* 56 Wis. 606, 608. The site to be selected was to comprise not less than 200 acres of land, with good drainage and sewerage facilities, and an abundant supply of pure water. It would hardly be expected to find such a site in a city or incorporated village. Besides, the act makes all the provisions of ch. 32, R. S., relating to the support of insane persons and the liability of counties therefor, applicable, as far as practicable, to persons admitted to the home for the feeble-minded. Sec. 4. Since the chapter of the Revised Statutes so made applicable has little or no reference to cities or villages, but deals throughout with counties, we must conclude that by the word "municipalities," as used in the act in question, the legislature intended to include counties.

2. It is contended that the language of the statute is not broad enough to authorize the proposed issue of the bonds. It is not contended that the county board would have had such power in the absence of ch. 138, Laws of 1895. By that act the state board of control was expressly empowered to " receive proposals for donations of money *or other securities* in behalf of this state for the benefit of such home," and may also " receive any donations or bequests which may be

Lund vs. Chippewa County and others.

made for its maintenance and support," and the "municipalities of this state" were thereby expressly "empowered to make the donations herein [therein] mentioned for the establishment and building of such a home." Sec. 2. The words "other securities" are certainly broad enough to include bonds. If the county board had power to issue such "securities," then, under the decisions of this court, they had the implied power to put them in the form of bonds. *Mills v. Gleason,* 11 Wis. 470; *State ex rel. Dean v. Common Council of Madison,* 7 Wis. 688; *State ex rel. Priest v. Regents of University,* 54 Wis. 170; *Gilman v. Milwaukee,* 61 Wis. 592; 1 Reid, Corp. Finance, § 8.

3. "The legislature may confer upon the boards of supervisors of the several counties of the state such powers of a local, legislative, and administrative character, as they shall from time to time prescribe." Sec. 22, art. IV, Const. Wis. In construing this provision of our constitution, this court has held "that, when any subject of legislation is intrusted to county boards by general words in a statute, they acquire a right to pass any ordinance necessary or convenient for the purpose of disposing of the whole subject so committed to them, and for that purpose have all the powers of the state legislature over that subject, unless the statute restricts the power, or directs its exercise in a certain way." *Supervisors of La Pointe v. O'Malley,* 47 Wis. 332; *Knight v. Ashland,* 61 Wis. 233. The county board was expressly empowered by statute "to apportion and order the levying of taxes, as provided by law, and direct the raising of such sums of money as may be necessary to defray the county charges and expenses, and all necessary charges incident to or arising from the execution of their lawful authority." Subd. 5, sec. 669, R. S.

4. It is contended that the authority thus given to the county by the act in question to donate to the state "money or other securities" "for the establishment and building of

such a home" was contrary to public policy, and therefore void.    This court has held that "the legislature may impose conditions precedent to the removal of a county seat, in addition to those imposed by the state constitution." *State ex rel. Park v. Supervisors of Portage Co.* 24 Wis. 49.    In that case the act which was held valid provided, in effect, that · after a majority of the votes should be cast in favor of removing the county seat to the city of Stevens Point, yet it should not be so removed until that city should first place at the control of the county board $10,000, with which to build county buildings at that place. · To the same effect is *Pepin Co. v. Prindle,* 61 Wis. 311–314.    Such donations have been sanctioned in several states.    Id., and cases there cited; *Beham v. Ghio,* 75 Tex. 87.    The donation here authorized was merely to secure a site for the home, and in no way affected the efficiency and successful operation of the institution when established.    Upon the authorities cited, we must hold that the authorizing of such donations was not against public policy.

5. The principal contention is that the authorization of such donations was repugnant to that clause of our constitution which declares that "the rule of taxation shall be uniform, and taxes shall be levied upon such property as the legislature shall prescribe."    Sec. 1, art. VIII.    This provision manifestly requires such uniformity, in case of a state tax, to extend throughout the state; in case of a county tax, to extend throughout the county; in case of a city tax, to extend throughout the city; and, in case of a town tax, to extend throughout the town.    In other words, the rule of uniformity is not broken merely because a town or city or county raises a special tax for local purposes.    If the proposed tax to pay the $12,700 in securities donated by *Chippewa* county may properly be regarded as a county tax, then the question of uniformity is not involved, since there is no pretense that, in levying that tax upon the tax-

able property in that county, any other than such uniform rule is to be followed. It is sought to bring the case within the condemnation of the constitutional provision quoted, on the theory that the proposed home is to be a state institution; that it is to be governed, controlled, and managed wholly by state officers and agencies; that it is to be established, built, and maintained by all the taxpayers and taxable property throughout the state,— including such property and taxpayers in *Chippewa* county; that the state would have had no power, by direct action, to compel one or more counties of the state, less than the whole, to pay an additional amount for such establishment, building, and maintenance; and hence that the legislature could not, by delegating such authority to such municipalities, do indirectly what, under the constitution, it could not have done directly. It is certainly to be a state institution; to be governed, controlled, and managed by the state; and to be established, built, and maintained by the state. But it does not follow that the state could not authorize a municipality in which it should be located to do what the state itself could not do directly. In speaking of the twofold character of such municipalities,— as agencies of the state government, and as "corporations endowed with capacities, and permitted to hold property and enjoy peculiar privileges for the benefit of their corporators exclusively,"— Mr. Cooley says: "The legislature may permit the incurring of expenses, the contracting of obligations, and the levy of taxes which are unusual, and which would not be admissible under the powers usually conferred. Instances of the kind may be mentioned in the offer of military bounties, and the payment of a disproportionate share of a state burden in consideration of peculiar local benefits which are to spring from it. But it is believed the legislature has no power, against the will of a municipal corporation, to compel it to contract debts for local purposes in which the state has no concern, or to as-

sume obligations not within the ordinary functions of municipal government. . . . The state, in such cases, may remove restrictions and permit action, but it cannot compel it." Cooley, Const. Lim. 230, 231. We have a good illustration in this state. Our constitution provides that "the state shall never contract any debt for works of internal improvement, or be a party in carrying on such works." Sec. 10, art. VIII. Nevertheless, the legislature has, from time to time, commencing with the early history of the state, authorized such municipalities to contract such debts, if not to be a party in carrying on such works, and such legislation has frequently been held to be valid. *Hasbrouck v. Milwaukee*, 13 Wis. 42; *S. C.* 80 Am. Dec. 718. Cases to such effect are numerous. *Attorney General v. Eau Claire*, 37 Wis. 400. That the legislature may authorize municipalities to levy taxes for purposes for which it cannot compel them to levy taxes might be illustrated by the citation of numerous adjudications, but it is unnecessary. See, however, *Brodhead v. Milwaukee*, 19 Wis. 624; *State ex rel. McCurdy v. Tappan*, 29 Wis. 664. This court has held that legislation to the effect that, where the cost of a bridge in a town exceeds a certain per cent. of all the taxable property of the town, the county may be required to pay one half of the cost thereof, is valid, and does not break the rule of uniformity. *State ex rel. Baraboo v. Sauk Co.* 70 Wis. 485.

6. Since the securities authorized to be donated in the case at bar are securities issued by the county, and since the proposed taxes in payment of the same are to be county taxes, the precise question presented is whether the purpose for which such securities were donated, and for which such taxes are to be raised, is such as to justify the provisions of the enactment in question. This court has sustained the validity of acts of the legislature authorizing municipalities to raise moneys by taxation to pay bounties to volunteers in the United States army. *Brodhead v. Milwaukee*, 19

Wis. 624; *State ex rel. McCurdy v. Tappan*, 29 Wis. 664. In those cases it was, among other things, in effect, held that while "the legislature cannot create a public debt, or levy a tax, or authorize a municipal corporation to do so, in order to raise funds for a mere private purpose," and while "the objects for which money is raised by taxation must be public, and such as subserve the common interest and well-being of the community required to contribute," yet, "to justify a court in declaring a tax void and arresting proceedings for its collection, the absence of all possible public interest in the purposes for which the funds are raised must be so clear and palpable as to be immediately perceptible to every mind;" that "claims founded in equity and justice, in the largest sense of those terms, or in gratitude or charity, will support a tax;" that "the legislature may authorize a town or other municipality to levy taxes therein for public purposes not strictly of a municipal character, but from which the public have received, or will receive, some direct advantage, or where the tax is to be expended in defraying the expenses of the government, or in promoting the peace, good order, and welfare of society, or in paying claims founded upon natural justice and equity, or upon gratitude for public services or expenditures, or in discharging the obligations of charity and humanity."

True, in *Whiting v. S. & F. du L. R. Co.* 25 Wis. 167, two of the three members of this court, as then constituted, held that an act authorizing a county to issue its orders in aid of the construction of a railroad therein, and to levy a tax to pay such orders, without becoming a stockholder in the company, was invalid, on the ground that such orders and tax were for a private purpose. But that case was expressly overruled, and the same act of the legislature was held valid, by the supreme court of the United States, on the ground that such railroad was a public highway, and hence the purpose of such county orders and county taxes in aid of

its construction was a public purpose. *Olcott v. Supervisors,*
16 Wall. 678. That decision has steadily been adhered to
since, and seems to be in harmony with the rule established
in most of the states. *Humbird v. Jackson Co.* 154 U. S.
592; *Roberts v. N. P. R. Co.* 158 U. S. 17, affirming *North-
ern P. R. Co. v. Roberts,* 42 Fed. Rep. 734; *Folsom v. Ninety
Six,* 159 U. S. 628, and cases there cited. Whatever force
may be given by this court to the decision of *Whiting v. S.
& F. du L. R. Co.,* it is manifest that it ought not to be ex-
tended.

Counsel cite *State ex rel. Board of Education v. Haben,* 22
Wis. 660, where it was held that "money raised in a city,
by taxation, for the purpose of erecting a high-school build-
ing, cannot be diverted by an act of the legislature, *without
the assent of the city or its inhabitants,* to the purchase of a
site for a normal school in said city." That decision does
not tend to invalidate the act in question, but rather tends
to support it. This is apparent from two extracts from the
opinion of DIXON, C. J., in that case, where he said: "To say
that the legislature can, *without the assent* of the proper mu-
nicipal authorities or of the inhabitants, take the money of
the city of Oshkosh, and appropriate it to the establishment
of a state normal school, is to say that it can take the money
of any municipal corporation, and apply it to any general
state purpose. . . . The *advantages* incidentally accru-
ing to the citizens of Oshkosh from the establishment of a
state normal school at that place, though sufficient, *with the
consent* of the legislature, *to justify* the citizens themselves,
or the proper municipal officers, in levying a tax to aid in
the purchase of a site or the erection of buildings, do not
change the nature of the question here presented." See *Gor-
don v. Cornes,* 47 N. Y. 608. In *Curtis's Adm'r v. Whipple,*
24 Wis. 350, the act to empower the town to raise money
by taxation for the benefit of "Jefferson Liberal Institute,"

a private corporation, was held invalid by two members of the court on the ground that it was "essentially a *private educational institution*," and by the other member of the court "mainly on the ground that the constitutional provisions for public schools of every grade" were exclusive. To the same effect, *Cole v. La Grange*, 113 U. S. 1.

In *County of Livingston v. Darlington*, 101 U. S. 407, an act of the legislature of Illinois establishing a state reform school, and authorizing municipal corporations to donate money to secure the location of the same within their limits, was sustained and held valid,— there being no settled or uniform decision to the contrary by the supreme court of that state. In Indiana, legislation authorizing counties to make donations for the purpose of securing the location of an agricultural college within their jurisdiction was held valid; and it was there further held that an obligation by the county for such purpose was "solely a county purpose, local in its nature, and properly assessed and collected as are taxes for other county purposes. *Marks v. Trustees of Purdue University*, 37 Ind. 155; *S. C.* 56 Ind. 288. So it has been held in Massachusetts that the legislature has power to pass an act authorizing a town to raise money for the establishment of an agricultural college therein. *Merrick v. Amherst*, 12 Allen, 500. See, also, *State v. Nelson Co.* 1 N. Dak. 88; Cooley, Const. Lim. 230, 231.

In the case at bar it must be conceded that the establishment and building of the "Wisconsin Home for Feeble-Minded" was and is a public purpose. It must also be conceded that there are peculiar and special benefits which will naturally spring from such location. This is manifest from the fact that numerous such municipalities, by a tender of such donations, entered into competition for such location. The right of convenient visitation by friends of the unfortunate inmates is of itself a valuable right. Without fur-

ther specification or discussion, we must hold the provisions of the act in question to be valid.

*By the Court.*— The order of the circuit court is reversed, and the cause is remanded with direction to sustain the demurrer, and for further proceedings according to law.

A motion for a rehearing was denied September 22, 1896.