State ex rel. New Richmond v. Davidson, 114 Wis. 563.

THE STATE EX REL. CITY OF NEW RICHMOND VS. DAVIDSON, 114     563
State Treasurer.                               116     ²567
                                            61 LRA  348

*December 17, 1901—January 7, 1902.*
*March 14—June 19, 1902.*

{1) *Supreme court: Original jurisdiction: Recovery of money from
state treasury.* (2, 3) *Constitutional law: Taxation: Appro-
priations: Public purposes: Releasing indebtedness to state.*

1. In view of the legislative policy declared in sec. 3200, Stats. 1898,
that suits against the state for money recovery shall be brought
only in the supreme court, it is *held* that a question of general
and public interest, warranting the exercise of the original ju-
risdiction of that court, is always involved in a suit whose ulti-
mate practical purpose is the recovery of public moneys from
the state treasury, although that result may be sought through
coercion of the individual action of state officers.

2. The taxing power of the state can be exercised only for public
purposes; and the determination of the legislature upon the
subject is not absolutely conclusive upon the courts.

3. A cyclone destroyed a large part of the city of New Richmond in
June, 1899, killing and injuring many of its inhabitants. To
bury the dead, care for the injured, clear up the débris to pre-
vent disease and pestilence, and to relieve and aid the home-
less, destitute, and impoverished, the city incurred large ex-
pense. Afterwards it borrowed from the state, out of the trust
funds, the sum of $21,400. At the next session of the legisla-
ture, ch. 286, Laws of 1901, was enacted, making an appropria-
tion from the general fund to the trust funds, for the purpose
of relieving the city of its indebtedness. *Held,* that the appro-
priation was not for an object purely local to the city of New
Richmond, but was for a public purpose, subserving the com-
mon interest and well-being of the people of the state at large,
and that the act was therefore valid.

DODGE, J., is of the opinion that the act in question might be
sustained under the power vested in the legislature (recog-
nized by sec. 8, art. VIII, Const.) to release or discharge a claim
or demand of the state; that the constitutional limitations upon
the power of taxation do not, by necessity, extend to or con-
trol the legislature in appropriations; and that appropriations
may be made to defray the expense of governmental acts, even
though they are to be done in a part of the state and not in the
whole.

MANDAMUS to the state treasurer. *Motion to quash alternative writ overruled.*

On December 17, 1901, the city of *New Richmond* applied for an original alternative writ of *mandamus* to command the respondent, as state treasurer, to act in obedience to ch. 286, Laws of 1901. The material parts of the petition are to the effect that the relator, by reason of distress to its citizens as the result of a violent cyclone, borrowed from the trust funds of the state, in 1899, $21,400, for which it is indebted; that by the act of legislature aforesaid, there was appropriated $21,400 out of any moneys in the state treasury for the relief of the city of *New Richmond;* and the state treasurer was commanded to transfer to the trust fund account the amount appropriated by that act, whereupon a corresponding amount of such indebtedness was commanded to be canceled. The treasurer refused to make such transfer, on the ground of alleged unconstitutionality of the act.

For the relator there was a brief by *W. F. McNally* and *L. K. Luse,* and oral argument by *Mr. Luse.*

The following opinion was filed January 7, 1902:

DODGE, J. The merits of the controversy have not been at all considered upon the application for this alternative writ, merely the propriety of this court assuming original jurisdiction to issue it. The policy and practice of this court on the subject of the exercise of its original jurisdiction have been so recently re-enunciated in *In re Court of Honor,* 109 Wis. 625, 85 N. W. 497, that reference to that case will suffice to define that policy in the main, and to indicate that several prior aberrations from the rule must not be considered as changing it. That jurisdiction will generally be made to depend upon the question, "Does the wrong to be redressed affect the sovereignty of the state, its franchises or prerogatives, or the liberties of its people?" In that case it was held that an application by a corporation to compel a state

officer to issue to it a franchise, although it involved the grant-
ing of a right by the state and construction of general laws,
did not fall within the rule, for the reason that "the wrong
to be redressed" was that of an individual, and the effect upon
the public generally was secondary only. In another late case,
where the subject was carefully considered, to wit, *In re
Town of Holland,* 107 Wis. 178, 83 N. W. 319, it was decided
that the wrong sought to be redressed did not become public
and general so as to justify this court in exercising its original
jurisdiction, simply because the party seeking vindication
was one of its minor municipal or political subdivisions, in
that case a town.

Those cases, taken together, would seem to rule the proposi-
tion that the present application, if measured only by the
injury threatened to the relator, was not public or general in
the sense of the rule prescribed to itself by this court, but
was a wrong suffered merely by the city in its corporate, as dis-
tinct from its political, capacity, and, if the effect upon the
state at large from the granting of the relief sought would
be only the same as that presented in the *Court of Honor
Case,* there could be little doubt that we should deny the writ.
A distinction, however, presents itself. In that case there
was sought to secure from the state of Wisconsin, acting by
one of its constituted officers, merely a license to do busi-
ness,—a right which the state had granted upon certain facts
existing or being found, and which it was the duty of the offi-
cer in question to recognize and satisfy if the facts existed.
Here the practical result of granting the relief prayed,
namely, commanding the state treasurer to act, is to enable the
relator to recover money from the state. Of course, in so do-
ing, to a certain extent the whole state is affected, although
such effect is perhaps not radically different in its nature
from the acquisition from the state of any other right which it
may give. But the recovery of money from the state has been,
both by the constitution and the legislature, placed in a class

by itself. Sec. 27, art. IV, of the constitution, evidently subjects the state to a suit for money recovery, but only in such manner as the legislature by statute shall provide. *Chicago, M. & St. P. R. Co. v. State,* 53 Wis. 509, 10 N. W. 560. The legislature, by sec. 3200, Stats. 1898, has authorized such suit to be brought only in the supreme court. Now, while such legislation perhaps in terms does not, and perhaps could not, either increase or restrain this court in the exercise of its original jurisdiction by writ of *mandamus* to compel actions of individual state officers, yet it declares a legislative policy in a field delegated by the constitution, and, whether controlling or not, is entitled to deference and to our utmost co-operation to give it effect. Such policy obviously is that the liability of the state to a money claim shall be tried only by the supreme court; that the commonwealth should not be subjected to the necessity of defending in local courts, nor to the burden of appeal from decision adverse to it. In deference to that policy, we deem it seemly and proper for this court to hold that a question of general and public interest is always involved in suits, the ultimate practical purpose of which is the recovery of public moneys from the state treasury, although that result may be sought by the machinery of coercing the individual action of state officers by one of our original writs. On that ground we have decided to allow the alternative writ of *mandamus* upon the present petition.

*By the Court.*—Let such writ issue as prayed.

The subsequent proceedings, as well as the substance of the petition for the writ, are thus stated by CASSODAY, C. J.:

The relator filed in this court a petition for an alternative writ of *mandamus* to compel the defendant, as state treasurer, to transfer from the moneys in the state treasury, not otherwise appropriated, the sum of $21,500 to the trust funds out of which the moneys were borrowed by the city, in order

that the commissioners of such funds may cancel the indebtedness of the relator to the state. The petition alleges, in effect, the incorporation of the relator as a city in 1885; the authority given by the common council of the city for the commencement of these proceedings, and the filing of the petition; that prior to June 12, 1899, the city had a population of 1,900 persons; that its business portion consisted of a large number of stores, shops, factories, hotels, and other places of business, besides a city hall, waterworks tower and tank, pumping station, numerous churches, and more than 200 homes; that its people were well to do, prosperous, and enjoying good health and other blessings usually attendant upon a prosperous city located and surrounded by an unusually fine farming community; that on the evening of June 12, 1899, a terrific cyclone struck the city, destroying the entire business portion thereof, killing outright, or injuring so that death ensued from such injuries, 115 of its citizens, and injuring about 500 more of its citizens, many seriously, destroying upwards of 100 dwelling houses and rendering about 600 of its citizens homeless, destroying its city hall, waterworks tower and tank and pumping station, its electric light plant, and the expensive bridge crossing the Willow river within the city, and four of its churches, killing 175 large animals and a large number of smaller ones, filling the public streets and alleys, and almost the entire area of the city, with debris, destroying property of more than three quarters of a million of dollars in value, leaving the city almost a complete wreck, and its inhabitants in sore and great distress; that it became and was absolutely necessary for the city to take immediate steps for the burial of its dead, the caring for its injured, clearing up of the debris to prevent disease and pestilence, at a large expense to the city, as well as placing upon all or nearly all of its citizens the great burden and almost insurmountable difficulties of caring for the dead and injured and homeless; that many of the citizens thereof lost all of their property,—their

homes, household effects, wearing apparel,—and were rendered entirely destitute; that others were so impoverished as to be unable to rebuild their homes, and it became and was absolutely necessary for the city to care for, render assistance to, and incur large expense in so doing; that by reason of the temporary care and aid furnished by the city to many of its citizens thus destitute and impoverished, and the expenditure of large sums of money in clearing away the debris mentioned, contagious disease and pestilence were .avoided, and its injured and homeless citizens, after much suffering, were enabled partially to overcome their destitute and impoverished condition, and, together with charitable assistance and aid given by public-spirited citizens of the state and elsewhere, many of its citizens have been able to get a new start, and rebuild their homes so destroyed, thus adding to the taxable property of the state not less than half a million of dollars, from which the state will in the future receive a revenue by way of taxation; that in December, 1899, the city borrowed. from the state, out of the trust funds thereof, $21,400, and issued and delivered to the state its negotiable bonds for the same, and thereby became and was indebted to the state in the sum mentioned; that the legislature of the state, at its first session after the occurrence of the cyclone, enacted ch. 286, Laws of 1901, entitled "An act to relieve the city of *New Richmond,* Wisconsin, from its indebtedness to the trust funds, and making an appropriation therefor."

That act was approved by the governor and published May 7, 1901, and the first section of the act provides that: "There is hereby appropriated out of any moneys in the state treasury not otherwise appropriated the sum of twenty-one thousand five hundred dollars for the purpose of relieving the city of *New Richmond* of its indebtedness to the state trust funds incurred after the tornado of June 12, 1899, which destroyed a large part of said city." The second section of the act provides for the transfer of the amount so appropriated to the

trust-funds account by the state treasurer, and that the trust-fund commissioners should thereupon cancel a like amount of the indebtedness of the city of *New Richmond.*

The petition further alleges that at all times since such enactment there has been ample money in the state treasury, not otherwise appropriated, to satisfy the appropriation made by the act, and which might lawfully be transferred to the trust funds as therein provided; that the defendant was and is state treasurer; that it was his duty to make the transfer required by the act; that he has neglected and refused, and still refuses, to so transfer said funds, though often requested by the city to do so, upon the sole ground that the act in question is unconstitutional and void.

Upon such petition, and after hearing counsel, an alternative writ of *mandamus* was issued by this court requiring the defendant to make such transfer, or show cause to the contrary. Upon the return day of the writ the defendant appeared by the attorney general of the state, *E. R. Hicks,* and by way of return to such writ moved to quash the same "for the reason that the facts stated therein are not sufficient to constitute a cause of action."

*The Attorney General* for the defendant. It is a significant fact that the petition nowhere states that the indebtedness of the city to the state trust funds was incurred *by reason* of the cyclone; but it is a fair presumption that the pleader intended to base the right of the city to the appropriation upon the fact that it had suffered such serious loss. In that view, the act of 1901 is in violation of sec. 3, art. VIII, Const., which provides that the credit of the state shall never be given or loaned in aid of any individual, association, or corporation; in violation of sec. 10, art. VIII, which declares that the state shall never contract any debt for works of internal improvement or be a party in carrying on such works; and in violation of sec. 13, art. I, which declares that the property of no person shall be taken for public use with-

out just compensation therefor. The law plainly, though indirectly, makes an appropriation from the general treasury of the state to a municipality. To sustain it, the state must have authority to levy a direct tax upon the people for such a purpose, place the moneys so collected in the general fund, and then appropriate such moneys from the general fund to the municipality. No such authority exists. Cooley, Const. Lim. *487, *488, *494 (6th ed. 598, 599, 606); Hare, Am. Const. Law, 279, 280, 284; Cooley, Const. Law, 56; Sedgwick, Stat. & Const. Law, *313, *314; *Att'y Gen. v. Eau Claire,* 37 Wis. 438; *Wis. Keeley Inst. Co. v. Milwaukee Co.* 95 Wis. 153–161; *Lowell v. Boston,* 111 Mass. 454; *Coster v. Tidewater Co.* 18 N. J. Eq. 54; *Tyler v. Beacher,* 44 Vt. 648; *Slate ex rel. Griffiths v. Osawkee Tp.* 14 Kan. 418; *Allen v. Jay,* 60 Me. 124. Money raised by taxation cannot be given away. *Hooper v. Emery,* 14 Me. 375; *Bristol v. Johnson,* 34 Mich. 123; *Citizens' S. & L. Asso. v. Topeka,* 20 Wall. 655–664; *William Deering & Co. v. Peterson,* 75 Minn. 118. If the state can appropriate for a private purpose the money in its treasury and then replace it by taxation, it can do indirectly what it cannot do directly. *Spencer v. School Dist.* 15 Kan. 259–262. Again, the taking of the private property of one person, under the form of taxation, and granting it to another, deprives the former of his property without due process of law. *Anderson v. Hill,* 54 Mich. 477, 20 N. W. 549; 6 Am. & Eng. Ency. of Law, 47.

For the relator there was a brief by *W. F. McNally* and *L. K. Luse,* attorneys, and *Sanborn, Luse, Powell & De Forest,* of counsel, and the cause was argued orally by *Mr. McNally* and *Mr. Luse.* They argued, among other things, that the legislature, being entitled to exercise all legislative power not expressly forbidden by the constitution, may exercise all the powers of Parliament, and appropriate public money for either a public or private purpose. *Wis. Cent. R. Co. v. Taylor Co.* 52 Wis. 60; *Council Bluffs & St. J. R. Co.*

*v. Otoe Co.* 16 Wall. 675; Cooley, Const. Lim. (6th ed.) 104, 288. It is conceded that the power of taxation can only be exercised for a public purpose; but the courts have been very careful, in so holding, not to infringe upon the right of the state or the power of its legislature to make a donation of funds acquired otherwise than by taxation. *Citizens' S. & L. Asso. v. Topeka,* 20 Wall. 655, 659; *Roberts v. N. P. R. Co.* 158 U. S. 1; *Lowell v. Boston,* 111 Mass. 454; *Att'y Gen. v. Eau Claire,* 37 Wis. 400; *Cole v. La Grange,* 113 U. S. 1; *Sutherland v. Evart,* 86 Fed. 597. Clearly analogous to the distinction above made is that drawn by this court between the proprietary interest of the state in property held by it and that to which it holds title in trust for the public. *McLennon v. Prentice,* 85 Wis. 444; *Priewe v. Wis. State L. & I. Co.* 93 Wis. 534; *Ill. Cent. R. Co. v. Illinois,* 146 U. S. 387. This court will take judicial notice that the state receives a large revenue from other sources than taxation, as for instance, license fees paid by foreign corporations, for peddler licenses, hunting licenses, and even the large amount received from railroad companies may be regarded as a license fee rather than a tax. *Fire Dept. v. Helfenstein,* 16 Wis. 136; *People v. Fire Asso.* 92 N. Y. 327; *Burlington v. Bumgardner,* 42 Iowa, 673; Cooley, Taxation, 586. As to whether the legislature of a state may donate public money for a private purpose, see *Daggett v. Colgan* (Cal.) 14 L. R. A. 474; *State v. Nelson Co.* 1 N. Dak. 88–98; Tiedeman, Lim. Police Powers, 476. The relation does not state for what purpose the money was borrowed, but the court will presume that it was for a lawful purpose, and manifestly the city could not borrow money and give a valid obligation to the state for anything but a public purpose; and if the debt was incurred for a public purpose it would seem to follow that the discharge of the municipality therefrom would be for a public purpose. As to what constitutes a public purpose, see *Att'y Gen. v. Eau Claire,* 37 Wis. 400; *Wis. W. Co. v. Winans,* 85 Wis. 26;

*Gleason v. Waukesha Co.* 103 Wis. 225; *Wis. Ind. School v. Clark Co.* 103 Wis. 651; *Trustees v. Roome,* 93 N. Y. 313; *Weismer v. Douglas,* 64 N. Y. 100; *Hill v. Easthampton,* 140 Mass. 381; *Hubbard v. Taunton,* 140 Mass. 467; *State ex rel. Douglas Co. v. Cornell,* 54 Neb. 72, 74 N. W. 59; *Daggett v. Colgan* (Cal.) 14 L. R. A. 474. Certainly the exercise of the police powers for public health, common good, or general welfare of the people is a public purpose within all of the authorities. *Slaughter-House Cases,* 16 Wall. 36; *Fertilizing Co. v. Hyde Park,* 97 U. S. 659; *Hayes v. Oshkosh,* 33 Wis. 314; *Schmidt v. Stearns Co.* 34 Minn. 112; *Wilkinson v. Long Rapids,* 74 Mich. 637, 41 N. W. 861; *Thomas v. Mason,* 26 L. R. A. 727; *State ex rel. Goodwin v. Nelson Co.* 8 L. R. A. 283; *Donnelly v. Decker,* 58 Wis. 461; *Comm. v. Alger,* 7 Cush. 53; *Thorpe v. R. & B. R. Co.* 27 Vt. 140. To hold a tax invalid because not for a public purpose it must appear that there was no possible public interest to be subserved by it. *Brodhead v. Milwaukee,* 19 Wis. 624; *Mills v. Charleton,* 29 Wis. 411; *Lund v. Chippewa Co.* 93 Wis. 640; *State ex rel. McCurdy v. Tappan,* 29 Wis. 664. Even where the money expended is raised by taxation it is not necessary that the entire state should be interested in the object of the tax. *Kingman Case,* 153 Mass. 566; *Talbot v. Hudson,* 16 Gray, 417; *State ex rel. Baraboo v. Sauk Co.* 70 Wis. 485; *Jenson v. Polk Co.* 47 Wis. 298, 313; *Rock Co. v. Edgerton,* 90 Wis. 288; *People ex rel. Einsfeld v. Murray,* 149 N. Y. 367, 44 N. E. 146. The purpose of this appropriation being public, it was for the legislature to determine whether the conditions were such as to warrant the exercise of its powers to relieve the city from some of its burdens. The court will not review the discretion of the legislature in exercising such powers. *Waterloo W. Mfg. Co. v. Shanahan,* 128 N. Y. 345, 28 N. E. 358; *Hovey v. Fosler,* 118 Ind. 502, 21 N. E. 39; *Soon Hing v. Crowley,* 113 U. S. 703; *Stevenson v. Colgan,* 91 Cal. 649, 27 Pac. 1089.

CASSODAY, C. J.   The importance of the question involved
is fully appreciated, and the case has received the very care-
ful consideration of every member of the court.   No one
doubts "that the state legislature has authority to exercise any
and all legislative powers not delegated to the federal govern-
ment, nor expressly or by necessary implication prohibited
by the national or state constitution." *Bittenhaus v. Johnston*,
92 Wis. 595, 66 N. W. 805, and cases there cited, and
*Wisconsin Keeley Inst. Co. v. Milwaukee Co.* 95 Wis. 156,
70 N. W. 68.   "So it is undoubtedly true, as claimed, that a
statute should, if possible, be so construed as not to be in con-
flict with the constitution."   *Id.*   The constitution provides
that "no money shall be paid out of the treasury except in
pursuance of an appropriation by law."   Sec. 2, art. VIII,
Const. Wis.   But this does not mean that the power to ap-
propriate money out of the state treasury is unlimited.   It
can only be so appropriated "by law," and that means a valid
law.   No construction is permissible which defeats the obvious
purpose and object of constitutional restrictions.   *Wisconsin
Keeley Inst. Co. v. Milwaukee Co., supra.*   "The power of
the government," says Mr. Tiedeman, "to embark in enter-
prises of public charity and benefit can only be limited by the
restrictions upon the power of taxation, and to that extent
alone can these subjects in American law be said to fall within
the police power of the state."   Tiedeman, Lim. 4; *Wisconsin
Keeley Inst. Co. v. Milwaukee Co.* 95 Wis. 157, 70 N. W. 68.
"It is implied in all definitions of taxation," says Mr. Cooley,
"that taxes can be levied for public purposes only."   Cooley,
Taxation (2d ed.) 103–105.   "It may be regarded as a
settled doctrine of American law," says Mr. Dillon, "that no
tax can be authorized by the legislature for any purpose which
is essentially private, or, to state the proposition in other
words, for any but a public purpose."   1 Dillon, Mun. Corp.
(4th ed.) § 508.   See, also, Hare, Am. Const. Law, 279.

        This court, as well as many others, has frequently declared

that the taxing power of the state can only be exercised for some object of public or common interest. *Soens v. Racine,* 10 Wis. 271, 279, 280; *Brodhead v. Milwaukee,* 19 Wis. 624; *Curtis's Adm'r v. Whipple,* 24 Wis. 350; *Whiting v. S. & F. du L. R. Co.* 25 Wis. 167; *State ex rel. McCurdy v. Tappan,* 29 Wis. 664, 687; *Att'y Gen. v. Eau Claire,* 37 Wis. 400, 436, 437; *Wisconsin Keeley Inst. Co. v. Milwaukee Co.* 95 Wis. 153, 70 N. W. 68; *Loan Asso. v. Topeka,* 20 Wall. 655, 663; *Allen v. Jay,* 60 Me. 124; *William Deering & Co. v. Peterson,* 75 Minn. 118, 77 N. W. 568. These adjudications, and many others which might be cited, seem to be based upon the broad ground that from the very nature of our state government there is running through our constitution an implied prohibition against forcing our citizens, by way of taxation, to contribute to any mere private purpose or enterprise, and that the determination of the legislature upon the subject is not absolutely conclusive upon the courts. Cooley, Taxation (2d ed.) 103–105. That learned author there quotes approvingly the language of the supreme court of the United States in the case above cited, where it is, among other things, said:

"The theory of our governments, state and national, is opposed to the deposit of unlimited power anywhere. The executive, the legislative, and the judicial branches of these governments are all of limited and defined powers. There are limitations on such power which grow out of the essential nature of all free governments; implied reservations of individual rights, without which the social compact could not exist, and which are respected by all governments entitled to the name. . . . To lay with one hand the power of the government on the property of the citizen, and with the other bestow it upon favored individuals to aid private enterprises and build up private fortunes, is none the less a robbery because it is done under the forms of law and is called 'taxation.' This is not legislation. It is a decree under legislative forms."

So Mr. Dillon declares that:

"We may readily conceive of acts of the legislature demanding sacrifices which could not be sustained as legitimate exercises of the taxing power, although no specific provision of the constitution should be infringed." 2 Dillon, Mun. Corp. (4th ed.) § 737.

But it is not seriously claimed that the object of the legislation in question was not public.

2. The question recurs whether every public object or enterprise may be promoted by taxation? Can the citizens of this state be compelled, by way of taxation, to contribute to any public purpose in Maine or California, or any foreign country? Can the citizens of Dane county be thus compelled to contribute to any public purpose confined to the county of Marinette or St. Croix? Can the citizens of the state be thus compelled to contribute to an object which is purely local, but nevertheless public? The learned author last cited says:

"There can be no legitimate taxation to raise money unless it be destined for the uses or benefit of the government, or some of its municipalities or divisions invested with the power of auxiliary or local administration. A public use or purpose is of the essence of a tax. Theoretically, the taxpayer is compensated for the taxes he pays in the protection afforded to him and his property by the government which imposes the tax; but the substantial foundation of the power is political, civil, or governmental necessity, and taxes are largely, if not wholly, as Mr. Mill insists, sacrifices for the public good, 'equality of sacrifice' being the rule dictated by justice. Equality, indeed, so far as practicable, is inherent in the very idea of a tax, as distinguished from arbitrary exaction." 2 Dillon, Mun. Corp. (4th ed.) § 736.

So Mr. Cooley declares that:

"Taxation is the equivalent for the protection which the government affords to the persons and property of its citizens; and, as all are alike protected, so all alike should bear the burden in proportion to the interests secured." Cooley, Const. Lim. (6th ed.) 608.

To the same effect, *Booth v. Woodbury,* 32 Conn. 118. In one of the cases cited Dixon, C. J., said: The legislature "cannot, in the form of a tax, take the money of the citizens, and give it to an individual, the public interest or welfare being in no way connected with the transaction. The objects for which money is raised by taxation must be public, and such as subserve the common interest and well-being of *the community required to contribute."* *Brodhead v. Milwaukee,* 19 Wis. 652: This is quoted approvingly in Cooley, Const. Lim. (6th ed.) 601, 602. Thus, in an early Pennsylvania case it is held that:

"By taxation is meant a certain mode of raising revenue for a public purpose in which the community that pays it has an interest. The right of a state to lay taxes has no greater extent than this." *Sharpless v. Philadelphia,* 21 Pa. St. 148.

In a later case in that state it is held that:

"An act authorizing the levy of contributions for a private purpose, or a purpose which, though public, is one in which the people from whom it is exacted have no interest, is not a law, but a judicial sentence, and not within legislative authority." *Grim v. Weissenberg,* 57 Pa. St. 433.

So in that state it is further held that:

"The rule is, local taxation for local purposes, or taxation on the benefits conferred, but not beyond them. The legislature, by its general powers, cannot levy, or authorize a municipality to levy, a local tax for general purposes. Taxation exacts money or services from individuals as their respective shares of contribution to any public burden." *Hammett v. Philadelphia,* 65 Pa. St. 146.

The authorities thus far cited relate to implied constitutional restrictions.

3. But we are not wanting in express limitations upon the power of taxation. In one of the cases cited Chief Justice Ryan, speaking for the court, said:

"Taxation is the absolute conversion of private property to public use. And its validity rests on the use. In legislativ grants of the power to municipal corporations the public use

must appear. . . . The legislature can delegate the power to tax to municipal corporations for public purposes only, and the validity of the delegation rests on the public purpose. Were this otherwise, as was said at the bar, municipal taxation might well become municipal plunder." *Att'y Gen. v. Eau Claire,* 37 Wis. 438.

Such language is in harmony with the authorities cited to the effect that the protection to the persons and property of the citizens is the compensation they receive for the tax imposed upon them. No constitutional provision is cited by the learned chief justice, but the statements made naturally suggest the constitutional provision which declares that "the property of no person shall be taken for public use without just compensation therefor." Sec. 13, art. I, Const. True, the right of condemnation is based upon a different theory than the right of taxation. *Sharpless v. Philadelphia,* 21 Pa. St. 147; *Booth v. Woodbury,* 32 Conn. 118. Nevertheless, the underlying principle is very much the same. In one of the cases cited it was, in effect, held that an act of the legislature which undertook to compel one town to levy a tax for a certain purpose, but did not impose a like obligation upon other towns, was in violation of the constitutional provision which declares that "the rule of taxation shall be uniform, and taxes shall be levied upon such property as the legislature shall prescribe" (sec. 1, art. VIII, Const.). *State ex rel. Mc-Curdy v. Tappan,* 29 Wis. 664. In construing that section, this court has recently said:

"This provision manifestly requires such uniformity, in case of a state tax, to extend throughout the state; in case of a county tax, to extend throughout the county; in case of a city tax, to extend throughout the city; and, in case of a town tax, to extend throughout the town. In other words, the rule of uniformity is not broken merely because a town or city or county raises a special tax for local purposes." *Lund v. Chippewa Co.* 93 Wis. 647, 67 N. W. 930.

If the object of the appropriation in question was purely local to the city of *New Richmond,* then the rule of uniformity would require the tax to supply the same to be limited to that municipality. If, however, the contribution was to subserve the common interest and well-being of the people of the state, then the appropriation was legitimate. The constitution also provides:

"The legislature shall provide for an annual tax sufficient to defray the estimated expenses of the state for each year; and whenever the expenses of any year shall exceed the income, the legislature shall provide for levying a tax for the ensuing year, sufficient, with other sources of income, to pay the deficiency as well as the estimated expenses of such ensuing year." Sec. 5, art. VIII, Const.

To that language must be applied the well-known maxim, *Expressio unius est exclusio alterius.* That construction limits such annual tax to an amount sufficient to defray such estimated expenses. *Att'y Gen. ex rel. Schantz v. Brunst,* 3 Wis. 793; *State ex rel. Crawford v. Hastings,* 10 Wis. 531; *Todd v. Lee,* 15 Wis. 376; *Price v. Wis. M. & F. Ins. Co.* 43 Wis. 292; *State ex rel. Priest v. Regents,* 54 Wis. 164, 11 N. W. 472. State taxes are thus only authorized to pay state expenses, or such expenditures as are authorized by the constitution.

4. Can we say that the appropriation in question was for a public purpose, and such as subserved the common interest and well-being of the people of the state? Had the legislature been in session June 12, 1899, when the terrible calamity struck *New Richmond,* could they, constitutionally, have made the appropriation in question to bury the dead, relieve the suffering, care for the helpless, and prevent disease and pestilence from spreading to other communities and the state at large? This court has held that:

"To justify a court in declaring a tax void, and arresting proceedings for its collection, the absence of all possible public interest in the purposes for which the funds are raised

must be so clear and palpable as to be immediately perceptible to every mind. Claims founded in equity and justice, in the largest sense of those terms, or in gratitude or charity, will support a tax." *Brodhead v. Milwaukee,* 19 Wis. 624; Cooley, Taxation, 127, 128.

Had the entire able-bodied population of the city been killed, there would seem to be no doubt that it would have been the duty of the state to bury the dead, care for the suffering, and relieve the helpless. This court has held that the administration of the criminal laws is a state affair, and that the officers engaged in such duties represent the sovereign power of the state. *Northern Trust Co. v. Snyder,* 113 Wis. 516, 538, 89 N. W. 460, 466. So we are constrained to hold that the state at large was concerned in the objects of the appropriation in question, and that, if the legislature had been in session June 12, 1899, it might legitimately have appropriated the amount mentioned for the object in question. This being so, it follows that the legislature had the power to pass the act in question to reimburse the city for such expenditures. No forecast could have anticipated and guarded against the calamity. The local authorities were powerless in the presence of such great destruction, suffering, and death. The condition of things, so suddenly precipitated, the claims of humanity, and the good of the state called for immediate and extraordinary relief. In passing the act the legislature were called upon to consider the whole situation. The people of the commonwealth were bowed in sorrow over the great calamity, and the call was for the immediate exercise of the police power of the state on a large scale. The object of the act being public, and to subserve the common interest and well-being of the people of the state at large, brought the subject legitimately within the power of the legislature. Having the power, the extent of its exercise was a matter of legislative discretion. If there was any doubt as to the power, duty would require us to resolve such doubt

in favor of the validity of the act. We cannot say that the act is invalid. On the contrary, and after very careful consideration, we have reached the conclusion that the act is valid.

*By the Court.*—The motion to quash the writ and the demurrer to the relation are overruled

Dodge, J. With the ultimate decision in this case to the effect that there might have been a general and public purpose warranting not only expenditure, but even taxation, by the state government, and therefore that the decision of the legislature to make the particular expenditure cannot be held void by the courts, I am in most cordial concurrence. I think, also, that the act reviewed might well have been sustained under the power vested in the legislature to release or discharge a claim or demand of the state,—a power expressly recognized by sec. 8, art. VIII, of the constitution. Neither have I serious doubt of the general correctness of the views expressed in the opinion of the court upon the limits surrounding the power of taxation. In that opinion I read, however, an inference at least, if not express suggestion, that similar limits rest upon the power of the legislature to appropriate public moneys already in the treasury, and I feel called upon to note my inability to concur in such view. The question, of course, is not strictly in this case. The present appropriation being valid, the court has not before it for decision the validity of a different one, and extended discussion may well be postponed until that question arises. I now merely feel called on to record my view that the limits upon the power of taxation do not, by necessity, extend to or control the legislature in appropriations. Upon the former rest all those express constitutional provisions which protect the individual against governmental aggression, for the act of taxation directly reaches the individual and his private property. It is, says Ryan, C. J., "the absolute conversion of

private property to public use." *Att'y Gen. v. Eau Claire,* 37 Wis. 400, 438. After the conversion is complete, however, the moneys acquired have become public, and are mingled with other public moneys and property. As such they are freed from many of the restraints upon interference with individuals and their property, and are protected by other constitutional provisions designed for that purpose. They may be paid out only in pursuance of an appropriation by law (sec. 2, art. VIII) ; i. e., by the legislative branch of the government. Such a law can only be passed by vote of a majority of a three-fifths quorum, taken by yeas and nays. Sec. 8, art. VIII. They shall not be paid for any claim not filed in six years (sec. 2, art. VIII), nor for carrying on works of internal improvement (sec. 10, art. VIII), nor for extra compensation after services are performed (sec. 26, art. IV). By these, and perhaps other, express provisions, the constitution fixes certain limits to the power to spend public moneys. The maxim, *Expressio unius est exclusio alterius,* excludes any purpose that other limits should exist.

Again, I find certainly the intimation that, if the object of the present appropriation was purely local to *New Richmond,* it might not be valid. If by "local" is meant "municipal," it may be that the express constitutional requirement that municipalities be created under local municipal government (sec. 3, art. XI) gives support to the idea, but from the context I do not understand the word to be so used, but to refer to an object to be accomplished in a part of the state, and not in the whole. In that sense I can find nothing in the constitution which warrants the court to override the decision of the legislature as to where public money may be spent. The constitution brought into existence a state government to govern the whole state, including every part. Public peace or health is as much within the protection of that government, whether the threat against them and consequent exercise of governmental power occurs only in the woods of Ashland, or

the prairies of Kenosha county, or throughout the state at large. It is not necessary that insurrection spread over the whole state before the militia may be put in service at state expense, nor that smallpox develop in more than one locality before the state boards of health may properly intervene. It is only by legislation, not by constitutional requirement, that the felon is arrested and tried by officers paid by a county. Indeed, the state at large does pay the judge before whom the trial occurs. In brief, it seems to me that the doctrine that the state cannot defray the expense of a governmental act if it be local is destructive of the efficacy of state government.