Filed April 26, 1889.

---

No. 14,868.

## HOVEY, GOVERNOR, ET AL. *v.* FOSTER.

STATE FINANCE.—*Act Authorizing Loan.—Constitutional Law.*—The act of March 11th, 1889 (Acts of 1889, p. 390), "authorizing the Governor, auditor and treasurer of State to make a loan for the purpose of carrying on the State government," does not violate section 5 of article 10 of the Constitution, and is a valid law.

SAME.—"*Casual Deficits.*"—*Meaning of Term.*—The term "To meet casual deficits in the revenue," as used in section 5 of article 10 of the Constitution, which specifies the contingencies in which the Legislature may authorize a debt to be contracted on behalf of the State, means a deficit not designedly brought about, but one resulting from casual or occasional discrepancies between the revenues received and the amounts required to provide for the general welfare and carry on the State government in the ordinary way, which could not be foreseen and provided for without the accumulation of an unnecessary surplus in the treasury.

SAME.—*Power of Legislature.*—*When its Action not Subject to Review.*—While the power of the Legislature to authorize a debt to be contracted on behalf of the State does not exist until a contingency contemplated by the Constitution arises, yet when such a contingency has in fact arisen, or when the Legislature, without any apparent purpose to evade the Constitution, determines that it has, its action is not subject to review or liable to be controlled by the judicial department, unless it is evident at

first blush that the conditions justifying the exercise of the power did not exist.

SAME.—*Deficit May be Anticipated.*—It is not necessary to the validity of an act authorizing the borrowing of money on behalf of the State that an actual deficit should exist at the time the act is passed, for a casual deficit, within the meaning of the constitutional provision, may be one that is anticipated and provided for, if it is foreseen that it must necessarily occur before other provisions for replenishing the public funds can be made available.

SAME.—*Method of Providing for Deficit.—Legislative Discretion.*—It is a matter within the discretion of the Legislature as to what provision shall be made, whether by increasing the tax levy or by contracting a debt, in order to provide for an inevitable deficit.

SAME.—*Title of Act.*—The fact that it is recited in the title of an act that the loan thereby authorized is for the purpose of carrying on the State government, rather than to provide for a casual deficit, is immaterial.

From the Marion Circuit Court.

*L. T. Michener,* Attorney General, and *J. H. Gillett,* for appellants.

*S. M. Shepard* and *C. Martindale,* for appellee.

MITCHELL, J.—By an act entitled "An act authorizing the Governor, auditor and treasurer of State to make a loan for the purpose of carrying on the State government, making provisions for the funding of the present outstanding temporary loan at a lower rate of interest, and concerning matters in connection therewith, and declaring an emergency," approved March 11th, 1889 (Acts of 1889, p. 390), the officers named in the above title were authorized to make a temporary loan of $700,000, and, if necessary to meet the appropriations made by the General Assembly, to make a further loan of a like sum, on or after the 1st day of September, 1889. For the purpose of borrowing the sums mentioned, the Governor, and other officers named, were authorized to issue and sell the bonds of the State, redeemable at the pleasure of the State after five years, and payable in ten years, bearing interest at three per centum per annum, payable semi-annually. There were other provisions in the act, having ref-

erence to the funding of the temporary loan indebtedness of the State, at a lower rate of interest.

The Governor, auditor and treasurer, proceeding under the authority conferred by the above mentioned act, caused a certain series of bonds, equal in amount to the loan authorized to be made upon the taking effect of the act, to be prepared, which they were about to negotiate and sell according to the terms of the act, when the relator instituted this proceeding to enjoin the chief executive and the other officers from making the loan, and from issuing or negotiating the bonds. The ground upon which the intervention of the court was asked is, that the Constitution expressly prohibits the authorization of any debt to be contracted on behalf of the State, except in certain enumerated contingencies. It is alleged that the debt about to be contracted was not intended to meet any of the contingencies provided for in the Constitution, and that the act was therefore unconstitutional and void.

It appears in the record by the answer of the respondents, that, prior to the meeting of the General Assembly in January, 1889, the auditor had made his official report to the Governor, in which he exhibited the financial condition of the State. Estimating the probable income to the treasury on the basis that the tax levy would be continued at the existing rate, and computing the amounts required to meet " immediate appropriations," which the auditor deemed necessary to be made by the Legislature soon to assemble, in order to cover existing obligations, and such other appropriations as in his judgment would be required to meet current and necessary expenses, and to complete buildings and improvements for various benevolent and other State institutions then under contract and in course of construction, it appeared that there would be a deficit in the revenues before the succeeding Legislature, in 1891, would assemble, amounting to $1,650,110.

In response to a resolution of the House of Representa-

·tives, asking the Governor for a statement of what deficien-·cies there would be in the revenues for the fiscal years end-·ing October 31st, 1889, and October 31st, 1890, and what amount of temporary loan, if any, would be necessary to conduct the business of the State, the executive laid before the House, in an official message, a detailed statement of the estimated receipts and expenditures for the two fiscal years then next to ensue.

It appeared in the message and the exhibits therewith sub-·mitted, that, if the tax levy was continued at the rate then fixed by law, it would be necessary, in order to pay the sums appropriated for various purposes by the General Assembly, at its session in 1887, which remained undrawn, and the sums appropriated by the Legislature then in session, and to defray the current expenses of carrying on the State govern-ment for two years, to make a loan of $2,200,000, so as to supply the deficiency in the revenues of the State thus cre-ated. After due consideration of the facts thus presented, the act in question, which authorizes a loan of $1,400,000, one-half of which was authorized to be made presently, and the remaining $700,000 on and after the 1st day of September, 1889, if it shall be necessary to meet the appropriations made by the General Assembly, was duly passed and approved. The question presented involves the constitutionality and validity of the act of the General Assembly under which the Governor and the other officers therein named were proceed-ing to make the loan.

Upon the subject of creating a debt the Constitution con-tains the following : "No law shall authorize any debt to be contracted on behalf of the State, except in the following cases : To meet casual deficits in the revenue ; to pay the interest on the State debt; to repel invasion, suppress insur-rection, or, if hostilities be threatened, provide for the pub-lic defence." Const., art. 10, sec. 5.

It is apparent that the purpose with which this provision was framed and adopted was to impose restrictions upon the

power of the Legislature to authorize debts to be contracted on behalf of the State to an unlimited amount. This is clear from the language employed. It is equally clear, too, that, upon the happening of certain contingencies, the power of the Legislature in respect to certain debts was to remain unfettered. On the one hand, the evils of an enormous public debt, the legacy of the system of public improvements in which the State had theretofore embarked, were fresh in the minds of the people when the present Constitution was adopted. This was the mischief that was not to be repeated. On the other hand, it was foreseen that without gathering from the pockets of the people, and carrying a large surplus in the treasury of the State, no human provision could prevent occasional deficits in the revenues. The tax levy could not possibly be adjusted to the necessary expenses of carrying on the State government, and of providing and maintaining the public buildings and institutions of the State, and for such other appropriations as are clearly within legislative discretion, without an occasional surplus or deficit. It was, therefore, contemplated that deficits would occur; that an enemy might invade, insurrection arise, or hostilities threaten, making provision for the public defence necessary. A public debt existed at the time, and interest thereon would mature. Upon the happening of either of these contingencies, the discretion of the Legislature, in providing the means to meet it, was, as necessarily it should have been, left without restriction. In all other respects the power of the Legislature to authorize a debt to be contracted on behalf of the State was taken up by the roots.

In order to justify the exercise of legislative discretion in the enactment of a law such as the one in question, there must have been a deficit in the revenues required to meet the ordinary appropriations made for the purpose of carrying on the government, and of providing for the general welfare of the State and its institutions. The deficit must have been casual, in the sense that it must not have been

designedly brought about by making extraordinary appropriations for purposes other than those above named, with a view to evade the constitutional inhibition, and to authorize the contracting of a debt on behalf of the State in disregard of its terms. It must have resulted from those casual or occasional discrepancies between the revenues received and the amounts required to provide for the general welfare, and carry on the State government in the ordinary way, which could not be foreseen and provided for without the accumulation of an unnecessary surplus in the treasury.

Words, in a constitutional provision, which were employed to confer a power upon the Legislature to contract debts on behalf of the State, in order to provide for the safety and general welfare of the people, while they are to be construed strictly as granting nothing outside of the contingencies enumerated upon which the exercise of the power depends, "are not to receive that limited and restricted interpretation and meaning which they would have in a penal statute, or in an authority conferred, by law or by contract, upon trustees or agents for private purposes." *Legal Tender Case*, 110 U. S. 421 (444).

While the power to act does not exist until the contingency arises, the Legislature must of necessity be left with large discretion in determining whether or not the contingency has arisen which calls forth the exercise of the power. When it has in fact arisen, or when, in the exercise of its sound discretion, the Legislature, without any apparent purpose to evade the Constitution, determines that it has, and authorizes a debt to be contracted, unless it is apparent at first blush that the conditions did not exist which justified the exercise of the power, the action of that body is not subject to review, or liable to be controlled by the judicial department. *Franklin* v. *State Board*, 23 Cal. 173.

Governments can not be conducted without lodging power somewhere. Wherever it may be lodged it is liable to be abused, or to be improvidently exercised. But while we as-

sert the power of the courts to decide on the constitutionality of every law that may be passed, we nevertheless recognize the rule as well settled, which declares that when an act is passed in the exercise of a power or duty expressly committed to the Legislature, or when the validity of an act depends upon the ascertainment of facts which must have existed antecedent to the law, all that courts can do is to inspect the act, and determine from its scope and tenor, and the concurrent history, of which they take judicial notice, whether or not it is apparently within the power conferred, assuming that the requisite facts were ascertained. The power of obtaining information for the purpose of framing laws to meet existing or apprehended contingencies, is within the legitimate province of a legislative body, and to that end it may summon witnesses and hear testimony in proper cases. *People* v. *Keeler*, 99 N. Y. 463; *Kilbourn* v. *Thompson*, 103 U. S. 168.

Courts can not make an issue of fact, or review the facts as such, upon which the Legislature must be presumed to have passed, in order to determine the validity of an act of the Legislature. *People* v. *New York Central R. R. Co.*, 34 Barb. 123 (138); *Lusher* v. *Scites*, 4 W. Va. 11; *State* v. *Noyes*, 47 Maine, 189; *Cass Township* v. *Dillon*, 16 Ohio St. 38 (41). All matters of public policy, or of political concern, or which affect the general welfare of the people, are subjects peculiarly within legislative discretion. Subjects relating to taxation and the revenues are peculiarly of that character. *Quick* v. *White-Water Township*, 7 Ind. 570 (576).

While the Legislature should see that revenues are raised and disbursed only for the public good, as has been well said, " what is for the public good, and what are public purposes, and what does properly constitute a public burden, are questions which the Legislature must decide upon its own judgment, and in respect to which it is vested with a large discretion which can not be controlled by the courts, except, perhaps, where its action is clearly evasive, and where, under

pretence of a lawful authority, it has assumed to exercise one that is unlawful." Cooley Const. Lim. (5th ed.), p. 155; *Heick* v. *Voight*, 110 Ind. 279; *Walker* v. *City of Cincinnati*, 21 Ohio St. 14; *Town of Rensselaer* v. *Leopold*, 106 Ind. 29.

An evasive or unlawful purpose will not be presumed; on the contrary, the courts will indulge all presumptions favorable to the action of a co-ordinate branch of the government. For example, the General Assembly is denied the power to pass special laws, except where a general law can not be made applicable. But as the Constitution does not declare the circumstances under which special laws may be passed, or what conditions must first exist before a general law can not be made applicable, it is the established rule that the Legislature is the exclusive judge of whether or not a law could properly be made general and of uniform application throughout the State. Hence the rule, that if a local law be enacted, it must be conclusively presumed that the Legislature found that a general law could not be made applicable. *Wiley* v. *Corporation of Bluffton*, 111 Ind. 152, and cases cited. It by no means follows that the power of the Legislature is without limit or control in respect to creating or contracting debts against the State. As before remarked, courts are supposed to take cognizance of the current public history of affairs, and to construe enactments of the General Assembly in the light of concurrent history. If, under pretence that an invasion was threatened, or that an insurrection was imminent, the Legislature should authorize a loan when it was a known fact to every intelligent person that the assumption was a mere pretence, courts would not hesitate to declare the act void. So, if it were known that the Legislature had authorized or was about to authorize the use of State funds in the construction of a railroad, canal, or other public work or institution, not within the ordinary and legitimate needs of the State, and that a loan was about to be authorized to meet appropriations made to defray the expense of such a work, under the guise of meeting a deficit

to carry on the government of the State, it would be the duty of the courts, when called upon, to take cognizance of the facts, and arrest what they would judicially know to be a mere pretext to evade the Constitution. *Williams* v. *Louisiana*, 103 U. S. 637. The court has no such knowledge concerning the enactment of the law here in question; on the contrary, the court has knowledge that the State has been engaged for several years in providing public buildings and necessary State institutions, and that unusual and unforeseen expenditures have been required, calling for appropriations of public money. We also take notice that a public law has been enacted under which a suitable memorial to the valor and patriotism of Indiana soldiers is in process of erection at the capital of the State. All these are subjects which pertain to the public welfare of the people, and are within ordinary legislative discretion. We are bound, therefore, to presume that the Legislature, acting upon official information received from the Governor and otherwise, after due deliberation upon all the facts, ascertained that in order to meet necessary appropriations, which it was their duty to make in order to cover past deficiencies and carry on the State government until the meeting of the next Legislature, a casual deficit would result in the revenues, such as authorized the contracting of a debt on behalf of the State.

The Constitution requires that no money shall be drawn from the treasury but in pursuance of appropriations made by law. The courts take notice of the fact that the meetings of the General Assembly are biennial, and that appropriations must be made in advance to cover the intervening two years, and until the meeting of the next General Assembly. It was therefore not necessary that an actual deficit should have existed in the revenues at the time the act was passed.

A casual deficit, such as may authorize the contracting of a debt on behalf of the State, may be one that is anticipated and provided for, if it is foreseen that it must necessarily oc-

cur before other provisions for replenishing the public funds can be made available. It was a matter within legislative discretion what provision should be made, whether by increasing the levy or by contracting a debt, in order to provide for the deficit which was inevitable.

It was the duty of the Legislature to make provision so that the executive and administrative departments could execute the laws and carry on the government of the State with credit to the people. Contracts have been entered into, in pursuance of public laws, which could not be abandoned or repudiated without violating good faith. It is a legitimate part of the conduct of the State government that the executive and administrative officers thereof be authorized, and furnished with the means, to save the credit of the State. That it was recited in the title of the act that the loan was authorized for the purpose of carrying on the State government, rather than to provide for a casual deficit, is of no consequence. All presumptions are to be indulged in favor of the validity of the law.

There are no valid objections to the law. The point made concerning the sufficiency of the title is not maintained. The conclusions thus reached result in a reversal of the judgment of the circuit court.

Judgment reversed, with costs.

Filed April 26, 1889.