## STATE *v.* MOORE.

### Opinion filed June 24, 1905.

$\frac{76}{77}\frac{197}{257}$

$\frac{76}{78}\frac{197}{462}$
$81\quad564$

$\frac{76}{84}\frac{197}{395}$

1. STATUTES—CONSTITUTIONALITY.—The power of courts to declare an act of the Legislature void because in conflict with the Constitution, either from want of power to enact it or from lack of observance of some of the forms or conditions imposed by the Constitution, should be exercised with great caution, and only when the terms of the Constitution have plainly been violated. (Page 199.)

2. SAME—PRESUMPTION.—The same presumption is indulged in favor of the validity of a legislative enactment with reference to its form and the constitutional prerequisites and conditions as with reference to the subject-matter of the legislation. (Page 201.)

3. LEGISLATURE—POWER TO DETERMINE NECESSARY EXPENSES OF GOVERNMENT.—While the power of the Legislature to determine what are "the necessary expenses of government," for which an appropriation may be made by a majority vote merely, under Const. 1874, art. 5, § 31, is not beyond control by the judicial department, yet, when an expense is such as may fall within that classification, and the Legislature has made appropriation, by a majority vote, to defray the same, the courts must accept as final the legislative determination that it is a necessary expense, even though it is not one of the ordinary expenses, of government. (Page 201.)

4. LEGISLATIVE APPROPRIATION—EXPENSES OF GOVERNMENT.—Under Const. 1874, art. 11, declaring what shall constitute the militia and providing

that the militia "shall be organized, officered, armed, equipped and trained in such manner as may be provided by law," and authorizing the Governor in certain contingencies to call out the militia to enforce the laws, etc., an appropriation "to promote the efficiency of the Arkansas State Guard" is an appropriation to meet "the necessary expenses of government" within Const. 1874, art. 5, § 31, which may be passed by a majority vote simply. (Page 203.)

5. APPROPRIATION BILLS—EMBRACING ONE SUBJECT.—The act of March 17, 1905, making an appropriation for the State Guard, in making an appropriation for the Adjutant-General, does not violate the provision of Const. 1874, art 5, § 30, to the effect that bills for appropriations other than the ordinary expense of the executive, legislative and judicial departments of the State shall be made by separate bills, each embracing but one subject. (Page 205.)

Appeal from Pulaski Chancery Court.

JESSE C. HART, Chancellor.

Affirmed.

*Robert L. Rogers, Attorney General,* and *Jas. H. Stevenson,* for appellant.

*Charles Jacobson,* for appellee.

McCULLOCH, J. The Attorney General brought this suit in the Pulaski Chancery Court to restrain the Auditor of State from drawing his warrant upon funds appropriated by an act of the General Assembly approved March 17, 1905, the title and preamble of which read as follows: "An act to promote the efficiency of the Arkansas State Guard, and for other purposes. Whereas, the strength of the Arkansas State Guard, shown by official roster, active force, aggregates 2,141 officers and men; and whereas, said organization has heretofore been recognized by the national government, receiving therefrom all allotments, under section 1661, Revised Statutes, as amended, or other laws: and whereas, it is essentially required of the organized militia, if same shall have further support of the national government, that certain duties be actually performed according to the laws of Congress relating thereto; and whereas, in order to carry out the provisions of the act of Congress approved January 21st, 1903, it is necessary that the State render financial aid to its citizen soldiery: Therefore, be it enacted by the General Assembly of the State of Arkansas," etc. The act then proceeds to appropriate the sum of $25,000, or

so much thereof as may be necessary, for the purposes provided for, specifying the items for which the same shall be expended, viz., salaries and contingent expenses of officers of the State Guard, for expenses of military encampments, practice, etc., rent of armories and storage rooms, and for other expenses in maintaining the organization of the State Guard, and handling and preserving the military equipments. The validity of the act is called in question on the ground that in neither branch of the Legislature, on the vote for final passage, did the bill receive in its favor the votes of two-thirds of the members of each house, as required by section 31 of article 5 of the Constitution of the State. That section of the Constitution and the preceding section read as follows:

"Sec. 30. The general appropriation bill shall embrace nothing but appropriations for the ordinary expense of the executive, legislative and judicial departments of the State. All other appropriations shall be made by separate bills, each embracing but one subject.

"Sec. 31. No State tax shall be allowed, or appropriation of money made, except to raise means for the payment of the just debts of the State, for defraying the necessary expenses of government, to sustain common schools, to repel invasion and suppress insurrection, except by a majority of two-thirds of both houses of the General Assembly."

It is conceded that the bill received in its favor the votes of a majority, but not two-thirds, of the members of each house. The Attorney General contends that the subject-matter of the appropriation does not fall within either of the exceptions expressed in section 31, and required for its passage the affirmative vote of two-thirds of both houses of the General Assembly. We are therefore asked to declare that on account of the failure to receive the necessary affirmative vote the bill never became a law. On the other hand, it is contended for appellee that the appropriation was for the "necessary expenses of government."

The duty and power of courts to declare an act of the legislative body void because in conflict with the Constitution, either from want of constitutional power to enact it or from lack of observance of some of the forms or conditions imposed by the Constitution, is so plain and well established that we indulge in no discussion of that question at this time. It is equally well

established, however, that such power should be exercised by the courts with great caution, and only when the terms of the Constitution have been plainly violated. Chief Justice MARSHALL, who first authoritatively announced the doctrine that courts possess such power, subsequently said: "The question whether a law be void for its repugnancy to the Constitution is at all times a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligation which that station imposes; but it is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other." *Fletcher* v. *Peck,* 6 Cranch, 87, 3 L. Ed. 162. A similar expression is given by the same learned court in the case of *Ogden* v. *Saunders,* 12 Wheat. 213, 6 L. Ed. 606, where Mr. Justice WASHINGTON said: "But if I could rest my opinion in favor of the constitutionality of the law on which the question arises on no other ground than this doubt so felt and acknowledged, that alone would, in my estimation, be a satisfactory indication of it. It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body by which any law is passed to presume in favor of its validity until its violation of the Constitution is proved beyond all reasonable doubt." Judge COOLEY, in treating the same subject, says: "The rule of law upon this subject appears to be that, except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operates according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise and oppressive legislation, within constitutional bounds, is by appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but the courts cannot assume their rights. The judiciary

can only arrest the execution of a statute when in conflict with the Constitution. It cannot run a race of opinions upon points of right, reason, and expediency with the lawmaking power." Cooley's Const. Lim. (7th Ed.) p. 236. The same learned author at another place (page 255) says: "The duty of the court to uphold a statute when the conflict between it and the Constitution is not clear, and the implication which must always exist that no violation has been intended by the Legislature, may require it in some cases, where the meaning of the Constitution is not in doubt, to lean in favor of such a construction of the statute as might not at first view seem most obvious and natural. For, as a conflict between the statute and the Constitution is not to be implied, it would seem to follow, where the meaning of the Constitution is clear, that the court, if possible, must give the statute such a construction as will enable it to have effect."

The same presumption is indulged in favor of the legislative enactment with reference to the form of the statute and the constitutional prerequisites and conditions as to the subject-matter of the legislation. *Waterman* v. *Hawkins,* 75 Ark. 120; Cooley, Const. Lim. p. 195.

This court, in the case of *State* v. *Sloan,* 66 Ark. 575, 53 S. W. 47, in upholding the validity of an act providing for the building of a new state capitol, the bill for which had not received the votes of two-thirds of both houses of the Legislature, said: "There is nothing in the Constitution of this State defining what is a necessary expense of government, or denying or limiting the right of the Legislature to determine the question. On the contrary, the right is impliedly delegated to it; for the power to appropriate money to defray the necessary expenses of government carries with it the right to determine what is a necessary expense. Upon this principle local and special laws have been upheld by this court, notwithstanding the Constitution denies to the Legislature the power to pass a special or local law in any case where a general law, which would afford the same relief, could be enacted; holding that the power to pass a special or local act under given circumstances empowered it to determine when the circumstances existed"—citing *Davis* v. *Gaines,* 48 Ark. 370, 3 S. W. 184; *Boyd* v. *Bryant,* 35 Ark. 73, 37 Am. Rep. 6; *Carson* v. *Levee District,* 59 Ark. 513, 27 S. W. 590; *Powell* v. *Durden,*

61 Ark. 21, 31 S. W. 740. To the same effect, see *St. Louis S. W. Ry. Co.* v. *Grayson,* 72 Ark. 119. The court in the Sloan Case did not mean to lay down the doctrine, nor do we now, that the power of the Legislature to determine what is a necessary expense of government is arbitrary, bounded by no limitations, and absolutely beyond control by the judicial department. We can readily call to mind subjects for appropriattion so obviously beyond the scope of what may be deemed necessary expenses of government that the courts could, and in duty should, ignore a legislative determination, and declare as a matter of law that the same do not fall within that class. The words "necessary expenses of government," as employed in the Constitution, do not refer to the necessity, expediency, or propriety for the amount of the appropriation, but are intended as a classification of a character of expenses which may be provided for by appropriations without the concurrence of more than a majority of both houses of the Legislature; and when the expense is such as may fall within that classification, and the Legislature has made appropriation to defray the same, the courts must accept as final the legislative determination that they are necessary expenses of government. The preceding section of the Constitution regulating appropriations to defray the ordinary expenses of government, when read with the section now under consideration, makes a distinction between the "ordinary expense of government" and other necessary expenses, and is a distinct recognition by the framers of the Constitution of the fact that there may be necessary expenses of government which are not ordinary expenses, and that the Legislature may, by a bare majority vote, make appropriations to defray the same. If they be necessary expenses of government—that is to say, proper and necessary expenses incurred in the administration of government—appropriations therefor may be made by a majority vote only, though they be extraordinary, and not incurred as ordinary expenses in the administration of government. The Supreme Court of Indiana, in dealing with a kindred subject relating to the power of the courts in passing upon the constitutionality of a statute, said: "While the power to act does not exist until the contingency arises, the Legislature must of necessity be left with large discretion in determining whether or not the contingency has arisen which calls

forth the exercise of the power. When it has in fact arisen, or when, in the exercise of its sound discretion, the Legislature, without any apparent purpose to evade the Constitution, determines that it has, and authorizes a debt to be contracted, unless it is apparent at first blush that the condition did not exist which justified the exercise of the power, the action of that body is not subject to review, or liable to be controlled by the judicial department." *Hovey* v. *Foster,* 118 Ind. 502, 21 N. E. 39. The Supreme Court of California, in speaking of the conclusive presumption to be indulged in favor of a statute, said: "In the exercise of their [the Legislature's] rightful authority, they have decided that the exigency has arisen demanding the exercise of the power, and they have directly declared that the object of the law and the debt created by it is to aid in repelling invasion, suppressing insurrection, enforcing the law, and preserving and protecting the public property: and this decision cannot be reviewed or set aside by the court." *Franklin* v. *State Board,* 23 Cal. 173.

The question, then, arises: Is the appropriation in question for the purpose of "defraying the necessary expenses of government," within the meaning of the Constitution, or is it obviously not what may be deemed a necessary expense of government? Since an early day the establishment, organization, and maintenance of the State militia as a citizen soldiery, instead of a large standing army maintained by the National government, has been the object of governmental solicitude and encouragement, both State and National. No useful purpose can be served by a discussion of that policy at length, as it is a part of the history of the republic. Suffice it to say that in each Constitution adopted by the people of this State an organized militia is provided for, and is distinctly recognized as a part of the executive branch of the State government. Article 11 of the present Constitution, which is similar to the provision on that subject in the former Constitutions of the State, declares what shall constitute the militia, and contains a mandatory provision that the same "shall be organized, officered, armed and equipped and trained in such manner as may be provided by law;" and that "the Governor shall, when the General Assembly is not in session, have the power to call out the volunteers or militia, or both, to execute the laws, repel invasions, repress insurrections and preserve the public peace in such man-

ner as may be authorized by law." Pursuant to the several Constitutions of the State, laws have at all times been written upon the statute books of the State providing for the organization of the militia and volunteer companies, and for the equipment and maintenance of the same as a part of the executive branch of the State government in the enforcement of the law and preservation of the public peace. We think it is therefore plain that the framers of the Constitution, in providing how appropriations should be voted "to defray necessary expenses of government," did not mean to exclude from that term the organization and maintenance of the militia, which was by that instrument, and which had ever been by the organic law of the State, recognized as an arm of the executive department of the State government. The legislative determination that the expense of maintenance of the organization was a "necessary expense of government" is conclusive, and cannot be reviewed by this court.

It is conceded by the Attorney General that the militia is a necessary part of the government; that the designation of the militia as "all able-bodied male persons, residents of the State, between the ages of 18 and 45 years," etc., constitutes the militia a branch of government, but it is insisted that the State Guard as a volunteer organization forms no part of the militia, nor of the State government. It will be observed, however, that the Constitution in the same article provides for the organization of volunteer companies, and provides that the Governor may call out either the volunteer or militia, or both, to execute the laws, etc., thus manifesting an intention to treat them both alike as a part of government. Stress is laid in the argument on the part of the State that the preamble of the act recites that, "in order to carry out the provisions of the act of Congress approved January 21, 1903, it is necessary that the State render financial aid to its citizen soldiery," and that this language negatives any intention on the part of the lawmakers to provide for the appropriation as a necessary expense of government. It is manifest, however, that the primary object of the Legislature was, as the title of the act plainly states, "to promote the efficiency of the Arkansas State Guard" by supplementing the funds offered for that purpose by the National government with an appropriation of the State's funds. Regardless of the forms and recitals of the act, it was an appropriation to maintain

the State Guard, and, as we hold that that is a part of the necessary expenses of government, the act must be sustained. We cannot look to the motives which influenced the members of the Legislature to determine the object and validity of a statute, nor can we review the legislation as to its propriety or expediency.

It is further urged against the validity of the act that it violates the provision of the Constitution (section 30, art. 5) to the effect that bills for appropriations other than the ordinary expense of the executive, legislative, and judicial departments of the State shall be made by separate bills, each embracing but one subject. It is argued that the part of the act making an appropriation for the use of the Adjutant General, in effect, repeals section 5295, Kirby's Dig., providing that the duties of Adjutant General shall be performed, without compensation, by the private secretary of the Governor, and that it is foreign to the main object of the bill. It is sufficient to use the language of Judge Cooley, which has been quoted with approval by this court, as follows: "The general purpose of these provisions is accomplished when a law has but one general object, which is fairly indicated by its title. To require every end and means necessary or convenient for the accomplishment of this general object to be provided for by a separate act relating to that alone would not only be unreasonable, but would render legislation impossible." Cooley's Const. Lim. (7th Ed.) p. 205. In State v. Sloan, supra, this court said: "The unity of the subject of an appropriation is not broken by appropriating several sums for several specific objects, which are necessary or convenient or tend to the accomplishment of one general design, notwithstanding other purposes than the main design may be thereby subserved."

The chancellor concluded that the statute in question was legally passed, and dismissed the complaint for want of equity. The decree is affirmed.

HILL, C. J., (dissenting.) Blackstone says: "An act of parliament * * * is the exercise of the highest authority that this kingdom acknowledges upon earth. It hath power to bind every subject in the land, and the dominions thereunto belonging, nay, even the King himself, if particularly named therein." 1 Black. Com. c. 2, p. 185. The "long train of abuses and usurpation" causing the Declaration of Independence im-

pelled the signers thereof to declare that "it is their [the people's] duty to throw off such government and to provide new guards for their future security." In the formation of the National government and in the governments of the several States written constitutions were evolved as new guards for future safety, and in them were placed limitations on the paramount power of the legislative department of government. A system of co-ordinate powers, each supreme in itself, and each fettered by the Constitution, was created. "The courts of law, State and Federal, held a place in our system unparalleled in the political system of other countries," says Thorpe in his Constitutional History. The same learned author points out that in the early days of American independence the idea prevailed that the legislature, succeeding to the power of parliament, was supreme; and that in 1787 the Court of Conference of North Carolina declared an act void for taking away the right of trial by jury, and its decision was vigorously assailed. It was, however, followed by other courts, and the principle was imbedded in the Constitution of the United States and the several States. 2 Thorpe, Con. History U. S. pp. 462-465. In 1803 the question came before the Supreme Court of the United States in *Marbury* v. *Madison,* 1 Cranch, 137, 2 L. Ed. 60, and was forever put at rest by the decision of Chief Justice MARSHALL. On this point the opinion is *obiter dictum,* but its reasoning ended all controversy on the subject, and made it clear that it was not only the right, but the solemn duty, of the judiciary to declare void any legislation violative of the Constitution. The chief justice asked: "To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limitations may at any time be passed by those intended to be restrained?" The answer was obvious. This subject was reviewed by the Supreme Court of the United States in *Mugler* v. *Kansas,* 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205, and it was again reiterated, that "the courts must obey the Constitution, rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, those limits have been passed." It is uncontrovertibly true that it is the duty of this court to determine whether the constitutional limitation that "no State tax shall be allowed, or appropriation of money made, except to raise means

for the payment of the just debts of the State, for defraying the necessary expenses of government, to sustain common schools, to repel invasion and suppress insurrection, except by a majority of two-thirds of both houses of the General Assembly," has been overridden by the act in question. The act is sought to be sustained as one "for defraying the necessary expenses of government." The argument is two-fold: (1) That the determination of what constitutes the necessary expenses of government is a matter exclusively for the General Assembly, and not the courts; and (2) that this is a necessary expense of government, within the meaning of the above-quoted clause. .

1. Is the Legislature the final arbiter of what is a "necessary expense of government?" The same question in different form has often been before the courts, and a few of the cases may be selected to show the trend of decision. The Constitution of South Carolina provided: "For the purpose of defraying extraordinary expenditures, the State may contract public debts, but such debts shall be authorized by law for some single object to be distinctly stated." The Legislature passed an act authorizing a public debt to be created "for the relief of the treasury." The court said: "The position taken by one of the counsel for appellants that the question whether a debt proposed to be contracted is for the purpose of defraying an ordinary or extraordinary expenditure is one exclusively for the determination of the Legislature, and the fact that they authorized the loan must be regarded as sufficient evidence that its object was to meet an extraordinary expenditure, would, it seems to us, render the constitutional provision wholly nugatory. Such a provision was undoubtedly inserted as a check upon the power of the Legislature to contract public debts, and it follows necessarily that it cannot determine conclusively the limits of its powers in this respect; for otherwise there would be no check upon its powers except its own will." *Whaley* v. *Gaillard,* 21 S. C. 560. This is equally true in this case. If this appropriation is not one "for defraying the necessary expenses of .government," then the check upon the Legislature inserted in the Constitution from passing such bills without a "majority of two-thirds of both houses of the General Assembly" is wholly nugatory; for, if a majority of the Legislature is the sole judge of its power, it could declare any appropriation to be

one for "defraying the necessary expenses of government," and leave its own will the sole check upon the treasury. In Georgia the Constitution forbids the Legislature from delegating to any county the right to levy a tax except for purposes therein mentioned, among others, "expenses of the courts." The Legislature passed an act requiring the county commissioners of Fulton County to levy a tax to pay fees claimed by former city solicitors. The court said: "It may be argued, however, that the Legislature has the power to determine and define, under this paragraph, what are expenses of courts, and the courts would be bound by its definition. This may or may not be true. It is unnecessary for us to determine in this case whether the Legislature can enlarge the common and usual meaning of these words or not. It is sufficient for us to say that the Legislature did not say that the claims of the defendants in error were expenses of court." *Adair* v. *Ellis,* 83 Ga. 464, 10 S. E. 117. In Indiana the Constitution says: "No law shall authorize any debt to be contracted on behalf of the State, except in the following cases: To meet casual deficits in the revenue; to pay the interest on the State debts, to repel invasion, suppress insurrection, or, if hostilities be threatened, provide for the public defense.": An act was passed authorizing a loan for the purpose of carrying on the State government, and making provisions for funding an outstanding temporary loan. The court said: "Governments cannot be conducted without lodging power somewhere. Wherever it may be lodged, it is liable to be abused, or to be imprudently exercised. But, while we assert the power of the courts to decide on the constitutionality of every law that may be passed, we nevertheless recognize the rule is well settled which declares that when an act is passed in the exercise of a power or duty expressly committed to the Legislature, or when the validity of an act depends upon the ascertainment of facts which must have existed antecedent to the law, all that the courts can do is to inspect the act and determine from its scope and tenor and the concurrent history, of which they take judicial notice, whether or not it is apparently within the power conferred, assuming that the requisite facts were ascertained. * * * It by no means follows that the power of the Legislature is without limit or control in respect to creating or contracting debts against

the State. As before remarked, courts are supposed to take cognizance of the current public history of affairs, and to construe enactments of the General Assembly in the light of concurrent history. If, under pretense that an invasion was threatened, or that insurrection was imminent, the Legislature should authorize a loan when it was a known fact to every intelligent person that the assumption was a mere pretense, courts would not hesitate to declare the act void." · Other illustrations are given of legislating for one purpose under the guise of another, which the courts must arrest. *Hovey* v. *Foster,* 118 Ind. 502, 21 N. E. 39.

This case plainly marks the limits of the Legislature, and designates the class of cases where the discretion of the Legislature must control; for instance, in determining whether a general law could be made applicable to a matter covered by a special one. The Indiana court, like this court in *Davis* v. *Gaines,* 48 Ark. 370, 3 S. W. 184, holds that no issue can be made on such discretionary matters, which are addressed solely to the discretion of the Legislature. As illustrating the finality of facts determinable by the Legislature may be found cases where the Constitution requires evidence of publication of notice of local bills. This class of cases was recently discussed and the authorities reviewed in *Waterman* v. *Hawkins,* 75 Ark. 120. The appellee urges *State* v. *Sloan,* 66 Ark. 575, 53 S. W. 47, as an authority conclusive on this court that the Legislature is the sole judge of what is necessary expense of government. In that case the then Attorney General called in question an act providing for the erection of a new capitol, and appropriating money therefor, on the ground that it was not a necessary expense of government, and consequently required two-thirds vote in each house. The court held that the Legislature was the proper forum in which the necessity for a new capitol was to be tried, and when it passed a bill in effect so declaring, then such finding was conclusive. Manifestly, this decision is right, for there was a question of fact and of legislative judgment on the necessity for such a public building, and, as aptly said in the Indiana case heretofore quoted from, "courts cannot make an issue of fact, or review the facts as such, upon which the Legislature must be presumed to have passed, in order to determine the validity of an act of the Legislature." Had the General Assembly declared new carpets necessary

14

for the legislative halls, no question could be raised on that fact. The determination of it is solely with the Legislature. And in no lesser degree the housing of the State government is a matter addressing itself solely to the Legislature, and its determination of the necessity final.   But it could not be questioned that if a succeeding Legislature, or several succeeding ones, should appropriate each $1,000,000 for a new capitol, these multitudinous capitols would be a pretext.   The language of Mr. Justice HARLAN in *Mugler* v. *Kansas, supra,* would be applicable to such legislation:"The courts are not bound by mere forms, nor are they to be misled by mere pretenses.   They are at liberty—indeed, are under a solemn duty—to look at the substance of things whenever they enter upon the inquiry whether the Legislature has transcended the limits of its authority."  · Other instances are supposed in *Hovey* v. *Foster,* where, even in face of legislative declarations bringing the act within a certain class, if the concurrent history proved it to be an evasion of the Constitution, the courts must annul it.   Therefore it is plain that, even in that class of legislation essentially in the discretion of the Legislature, like capitols and public buildings and works and other matters of that class, the legislative authority is not beyond the power of the judiciary when it palpably invades the Constitution, and its own declarations are not conclusive on the subject.   In view of these authorities, it cannot be said that the Legislature was, in the class of legislation now before the court, the final arbiter of whether the appropriation was a necessary expense of government.

2. This view brings the act itself for consideration.   Read in the light of "concurrent history," it cannot, in these days of profound peace, be sustained as necessary in order to "repel invasion and suppress insurrection."   It is gratifying to know that civil process is served and obeyed in the remotest hamlet in the State.   The question recurs under the clause that this appropriation must be to defray "the necessary expenses of government," or it is invalid.   In the first place, the act bears its death wound on its face.   It declares: "Whereas, in order to carry out the provisions of the act of Congress, approved January 21, 1903, it is necessary that the State render financial aid to its citizen soldiery; therefore, be it enacted," etc.   This is foreign to a declaration that the appropriation is a necessary expense of gov-

ernment, for the necessity for this legislation is declared to be to render financial aid to the citizen soldiery in order to obtain the benefit of an act of Congress which apportions funds to the State Guards in proportion to the representation when the State Guards hold practice marches for at least five days in each year, and assemble for drill, instruction, and practice at least 24 times a year, and other details. Hence the reason for this bill, as declared on its face, is to provide funds for practice marches, drills, instructions, etc., in order to fulfill the requirement of the acts of Congress in bringing the militia to a standard required in order to obtain more funds to be used for like purposes. The members of the General Assembly could well vote for this bill, deeming it a very proper subject for an appropriation, without ever having their attention drawn to whether it was a necessary expense of government, or merely a proper expense. In fact, the bill negatives the idea that it is a necessary expense of government, and shows on its face a very proper subject for favorable consideration on other grounds; and, if two-thirds of both houses had so regarded it, then no question could be raised, but two-thirds did not regard it either proper or necessary. In the next place, aside from the declaration referred to, it cannot be said of this appropriation that it is a necessary expense of government. It is argued that the Constitution recognizes the militia, and provides for its organization, equipment, and training by the General Assembly, and therefore this appropriation made under its express sanction renders it valid as a necessary expense of government. The conclusion does not follow the premise, because the provision for this organization, equipment, and training carries no intimation or inference that the same is necessary to the government, but merely that it is a proper subject for legislative action. There are many similar provisions in the Constitution. For illustration, it provides that the General Assembly shall pass such laws as will foster and aid the agricultural, mining, and manufacturing interests of the State. Article 10, § 1. If the Legislature passed a law for the agriculturalists to hold county meetings at least 24 times a year, and a State meeting for five days each year, where they were trained and instructed in agriculture, no one would deny that an appropriation to meet the expenses incident to these gatherings would be a proper field for legislation; and

yet bold would he be who asserted, as a legal proposition, that such an appropriation was a "necessary expense of government." It has equal constitutional encouragement, and a more mandatory duty is laid on the Legislature to foster agriculture than there is is to arm, equip, and train the militia. Again, the Constitution provides: "Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free schools whereby all persons in the State between the ages of six and twenty-one may receive gratuitous instruction." "The supervision of public schools and the execution of the laws regu-´ lating the same shall be vested in and confided to such officers as may be provided for by the General Assembly." Const. art. 14, § § 1, 4. Certainly, article 11, providing for the organization, equipment, and training of the militia under laws to be passed by the General Assembly, is not as mandatory for such legislation as these provisions requiring the organization and maintenance of free schools under officers to be provided by the Legislature.

It is significant that, when the framers came to provide what appropriations could be made by majority vote, they classed support of the common schools on equal terms as not a part of the necessary expenses of government, and provided that these two objects and expenses to repel invasion or suppress insurrection should be the only three purposes for which money could be voted out of the treasury without a two-thirds vote. A stronger argument could be made on the constitutionality of expenses for the maintenance of free schools as a necessary expense of State government than in favor of the militia, and yet the Constitution makers themselves recognized that it was not within that clause, and expressly put them on equal footing. But it is argued that the militia is part of the executive branch of government, and subject to service as such. In time of invasion and insurrection it is a necessary arm of government, and the Constitution expressly provides that in such times only a majority is required to take money from the treasury to defray the expenses of militia, as well as other expenses incident to such commotions. The Constitution makes the militia of the State consist of all able-bodied male residents between the ages of 18 and 45 years (with a few exceptions), and renders them subject to the call of the General

Assembly, or, in its vacation, the Governor, to execute the laws, repel invasion, suppress insurrection, and to preserve the peace. The sheriff, in the execution of the law, the preservation of peace, and the suppression of riots and insurrection, has like power over the militia, and also over all the male inhabitants of his county. Subdivision 24, c. 49, Kirby's Dig. The reasoning which leads to the conclusion that the training and drilling of the militia is a necessary expense of government would lead to the conclusion that the training of every male inhabitant in the science of war is a necessary expense of government, for every one is subject to the same duty to the State to execute its laws and preserve its peace. The government of Germany considers such training of all its male subjects necessary for its preservation, and the result is that the empire of Germany is one great armed camp, and every citizen a trained soldier, and taxes rest heavily on the people. In consequence of this policy the flower of German youth turn to this country, where experience has taught that this burden is not necessary to government. President Washington, in his sixth annual message to Congress, said: "The devising and establishing of a well-regulated militia would be a genuine source of legislative honor and a perfect title to public gratitude. I therefore entertain a hope that the present session will not pass without carrying to its full energy the power of organizing, arming, and disciplining the militia, and thus providing, in the language of the Constitution, for calling them forth to execute the laws of the Union, suppress insurrections, and repel invasions." 1 Richardson, Messages & Papers of the Presidents, p. 167. Mr. Jefferson, in his first inaugural, in the enumeration of essential principles of government which ought to shape its administration, mentioned these: "A well-regulated militia, our best reliance in peace and for the first moments of war, till regulars may relieve them; the supremacy of the civil over the military authority; economy in the public expense, that labor may be lightly burthened." Id. p. 323. In presenting the cause of militia organization for favorable legislation, these greatest of the Presidents fail to present it as a necessary expense of the government, but present it as one well worthy the favorable consideration of the lawmakers. If the case could not be stronger presented when the government was just emerging from the

Revolution, and when civil disorders were prevalent, and Indian warfare a menace on the border, what can be said in its favor as a necessary expense of government in these "piping times of peace?"

The time-honored theory of a free government is that its safety depends on its citizens, not its standing army; and to that end militia organizations have always found encouragement in legislation which has heretofore been generous in titles and sparing in appropriations. Part of the laws now found in Kirby's Digest on militia organization date back to 1845. The first appearance, however, of salaries in time of peace to militia officers, and appropriations for military training and practice, are found in this act and its prototype of 1903. These favorable considerations of militia organization and training, however, find reflection in the statutes of many of the States of the Union, in acts appropriating money for purposes in some respects similar to the act in question. This State in 1903 appropriated $6,220 "to promote the efficiency of the State Guard," of which $4,000 were for military encampments and practice marches. There was no showing on the face of the bill that it was for any other purposes than to promote the efficiency of the militia, and this bill contains the same title, and adds in a preamble the necessity of the appropriation in order to obtain the government aid, presumably to further promote the efficiency of the militia. This is the sole declared purpose of this legislation, and to treat it as necessary expenses of government, when the General Assembly has not so declared, and no one so declared except perchance the presiding officers of the houses in declaring the bill passed on majority votes, would be straining an act belonging to one class into another. The courts always hesitate in differing with a co-ordinate branch of the government, but in this case the hesitation should not be so pronounced, because there is no evidence that the General Assembly has ever considered and determined that this act was a necessary expense of government. The presiding officers of both houses must have so classed it, or else it would not have been declared carried on majority votes. It may be that their attention was not called to this section of the Constitution, or in the hurry of legislative proceedings they did not have time to consider or investigate it. In fact, if they had each ruled that it required two-

*thirds* votes, a majority could have overruled their decisions, and, without the courts determining it, a bare majority could withdraw money from the treasury, and overrule the Speaker and President, and thus set at defiance the constitutional limitations imposed upon them. The Constitution is committed to the judiciary to preserve, and, in the exercise of that duty, this act ought to be declared void.